IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 17, 2001 Session

## WILLIAM ISAAC EATON, by next friend CALLIE LOUISE JOHNSON v. ELNORA EATON, ET AL.

**Direct Appeal from the Chancery Court for Tipton County**
**No. 15,921    Dewey C. Whitenton, Chancellor**

---

**No. W2001-00576-COA-R3-CV - Filed November 7, 2001**

---

This case involves the sale of the plaintiff's land to the defendant. The plaintiff's attorney in fact, pursuant to a valid durable power of attorney, sold the land to the defendant. The trial court held that the transaction between the attorney in fact and the defendant was fair, valid and binding as to the plaintiff. The plaintiff, by next friend, appeals the ruling of the trial court. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS and HOLLY K. LILLARD, J.J., joined.

J. Thomas Caldwell, Ripley, Tennessee, for the appellant, William Isaac Eaton.

T. D. Forrester, Covington, Tennessee, for the appellee, Kelcot Warehouses, L.L.C.

**OPINION**

William Isaac Eaton (Mr. Eaton) owned a farm in Tipton County, Tennessee. In 1976, Mr. Eaton met Richard Kelly (Mr. Kelly), the managing partner of Kelcot Warehouses, L.L.C. (Kelcot). In the early 1980's, Mr. Kelly began renting Mr. Eaton's farm. While renting and farming Mr. Eaton's property, Mr. Kelly became well acquainted with Mr. Eaton. On several occasions, Mr. Eaton offered to sell the farm to Mr. Kelly. Each time Mr. Eaton offered the farm, the price was the same - $75,000. Mr. Kelly always rejected the offer, maintaining that the price was too high.

In 1994, Mr. Eaton and his sister-in-law, Elnora Eaton (Elnora), visited Mr. Kelly on the farm.[1] Mr. Eaton informed Mr. Kelly that Elnora was going to begin handling his business affairs. On September 6, 1994, Mr. Eaton executed a Durable Power of Attorney appointing Elnora as his lawful agent and attorney in fact. The Durable Power of Attorney provided that Elnora, who was Mr. Eaton's sister-in-law, had the power to convey Mr. Eaton's real estate.

Mr. Kelly continued to rent the property and when he began to negotiate the rent in January 1997, Elnora told Mr. Kelly that she required part of the rental fee in advance. Mr. Kelly answered her request, stating, in effect, that he would be better served by purchasing the farm. Elnora agreed, and the parties began negotiating the sale of the farm.

Prior to meeting again with Elnora, Mr. Kelly contacted an attorney, David Owen (Mr. Owen). Mr. Kelly wanted Mr. Owen to determine whether Elnora had the authority to convey the property, for Mr. Kelly knew that Mr. Eaton did not have the mental capacity to convey the land. Mr. Kelly sought the advice of Mr. Owen and was advised that Elnora was properly authorized to transfer the property through the Durable Power of Attorney.

Sometime after Mr. Kelly's meeting with Mr. Owen, Mr. Kelly met with Elnora and Mr. Eaton's estranged wife, Esther Lee Eaton (Esther Lee).[2] Mr. Kelly offered to purchase the farm for $75,000. Elnora initially rejected the offer as insufficient. Later, however, she accepted the offer of $75,000 and agreed to convey the property to Mr. Kelly.

On February 5, 1997, Elnora, pursuant to her power of attorney, executed a warranty deed conveying Mr. Eaton's farm to Kelcot. Mr. Owen conducted the real estate closing. From the proceeds of the sale, Mr. Owen issued a check payable to Mr. Eaton and presented the check to Elnora. After the closing, Mr. Kelly told Mr. Owen that he was concerned about Mr. Eaton. Mr. Kelly asked Mr. Owen for his opinion as to how Elnora and Ester Lee would handle the money. Mr. Owen told Mr. Kelly that he should not be concerned about how Elnora and Ester Lee would disburse the funds. Reiterating his concern about Mr. Eaton, Mr. Kelly gave Mr. Eaton a lease on the property.

Mr. Kelly's concerns were well-founded. Elnora split the proceeds of the farm, which were $57,004.59 after satisfying a mortgage, with Ester Lee. Elnora claimed she used a portion of her proceeds to make repairs to Mr. Eaton's house, now owned by Mr. Kelly. Elnora, however, could not produce any records of these repairs. Elnora also stated that a portion of the money, $2,500, is in a safe deposit box. Esther Lee stated that she spent her portion of the farm proceeds on bills and a car. Esther Lee maintains that she no longer has any of the money.

---

[1] For the sake of clarity, we will refer to Elnora Eaton by her first name. We will do the same with Esther Lee Eaton.

[2] It appears from the record that Mr. Eaton and Ester Lee Eaton remain married, however, Ester Lee has not lived with Mr. Eaton since 1993 or 1994.

Mr. Eaton[3], by next friend, sued Elnora Eaton, Esther Lee Eaton, and Kelcot Warehouses. Mr. Eaton wanted the trial court to set aside the land sale transaction. After a bench trial, the court entered judgment in favor of Mr. Eaton against Elnora and Esther Lee. The court held that

> all funds disbursed or used by Elnora Eaton that are not specifically shown to have been spent for the direct benefit of William Isaac Eaton, including all funds paid to his wife, Esther Lee Eaton, are unauthorized, illegal and in direct violation of the fiduciary duties and trust responsibilities that Elnora Eaton had to Mr. Eaton.

In holding Elnora and Esther Lee Eaton jointly and severally liable, the court imposed an equitable lien on all property owned by Elnora and Esther Lee and issued a permanent injunction against the sale of such property.

While Mr. Eaton prevailed against Elnora and Esther Lee, he was not successful in his efforts against Kelcot. In ruling in favor of Kelcot, the court stated that the "crucial test is whether a reasonable person would have been placed on notice of the irregularity of the transaction, and knew or should have known that the act complained of was not in the incompetent's best interest." Stating that the real estate sale was a "fair, valid and binding transaction . . . expressly authorized by the durable power of attorney," the court removed any cloud on Kelcot's title to Mr. Eaton's property and dismissed Mr. Eaton's claim against Kelcot.

Mr. Eaton appeals the trial court's decision to dismiss the complaint against Kelcot. The issues on appeal, as stated by Mr. Eaton, are as follows:

I.      Whether the trial [c]ourt erred in holding a validly executed Durable Power of Attorney precluded a finding of collusion and fraud by the attorney in fact and a third party?

II.     Whether the trial [c]ourt erred in failing to set aside the deed from the agent acting under [the] Durable Power of Attorney to the Defendant, Kelcot Warehouses, L.L.C.?

To the extent these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d). We may not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. *Id.* With respect to the court's legal conclusions, our review is *de novo* with no presumption of correctness. ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000).

---

[3]Elnora admitted Mr. Eaton into a nursing home on November 17, 1997, when Mr. Eaton was 81 years old. The initial evaluation of Mr. Eaton stated that Mr. Eaton had dementia, and he was diagnosed with early Alzheimer's disease. Mr. Eaton did not testify at trial and remains in the nursing home as a total care patient.

Section 34-6-102 of the Tennessee Code defines a durable power of attorney as a "power of attorney by which a principal designates another as the principal's attorney in fact in writing . . . showing the intent of the principal that the authority conferred shall be exercisable, notwithstanding the principal's subsequent disability or incapacity." Tenn. Code Ann. § 34-6-102 (1996). Acts performed by an attorney in fact pursuant to a durable power of attorney "during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal . . . as if the principal were competent and not disabled." Tenn. Code Ann. § 34-6-103 (1996). As the acts done by an attorney in fact will bind the principal while under a period of disability or incapacity, it follows that an attorney in fact is vested with a great deal of responsibility. One acting pursuant to a durable power of attorney must act in the principal's best interests and within the scope of authority granted by the statute[4] and the principal. Thus, the relationship between the attorney in fact and the principal is subject to the laws of agency. *See Kerney v. Aetna Cas. & Sur. Co.,* 648 S.W.2d 247, 252 (Tenn. Ct. App. 1982 (quoting *Howard v. Haven*, 281 S.W.2d 480 485, 1955)) (stating that "[a]gency in its broadest sense includes every relation in which one person acts for or represents another."); 3 Am. Jur. 2d *Agency* § 23 (1986) (stating that "[i]n many respects, questions concerning agents holding powers of attorney are substantially the same as those governing agents generally.").

In Tennessee, the relationship between the agent and principal is fiduciary in nature and generally treated with the same gravity and strictness as the trustee-beneficiary relationship. *Marshall v. Sevier County*, 639 S.W.2d 440, 446 (Tenn. Ct. App. 1982). An agent, as a fiduciary, is under a duty of loyalty to the principal. *Pridemore v. Cherry*, 903 S.W.2d 705, 707 (Tenn. Ct. App. 1995) (citing *Gay & Taylor, Inc. v. Am. Cas. Co.*, 381 S.W.2d 304, 305 (Tenn. Ct. App. 1963)). Accordingly, in matters connected with the agency, the agent must serve only the principal; the agent cannot act for themselves or in the interests of others. *Heard v. Miles*, 222 S.W.2d 848, 851 (Tenn. Ct. App. 1949).

There are circumstances where a third party may be liable to a principal due to the agent's breach of fiduciary duty. Section 314 of the *Restatement (Second) of Agency* states as follows:

> A person who receives the principal's property from an agent of another, with notice that the agent is thereby committing a breach of fiduciary duty to the principal, holds the property thus acquired as a constructive trustee, or at the election of the principal, is subject to liability for its value; one who receives such property, non-tortiously and without notice, but who is not a bona fide purchaser, is subject to liability to the extent to which he has been unjustly enriched.

---

[4]Section 34-6-109 of the Tennessee Code provides specifically enumerated powers possessed by an attorney in fact who is appointed pursuant to a durable power of attorney. Tenn. Code Ann. § 34-6-109 (1996).

*Restatement (Second) of Agency* § 314 (2000). Further, if a third person intentionally causes or assists an agent to violate their fiduciary duty to the principal, the third person is subject to liability in tort for any harm they have caused the principal or in a restitutional action for profit they derived from the transaction. 3 Am. Jur. 2d *Agency* § 299 (1986). Finally, a contract executed between the principal's agent and a third party is voidable at the option of the principal if collusion existed between the agent and the third party. *Hawkins v. Byrn*, 261 S.W. 980, 982 (Tenn. 1924); 1 Tenn. Jur. *Agency* § 55 (2001).

In the present case, Mr. Eaton does not argue that the durable power of attorney was invalid at the time of its execution. Instead, Mr. Eaton's first argument is that the trial court erred by holding that a durable power of attorney precluded a finding of collusion and fraud between Elnora and Mr. Kelly. We disagree with this interpretation of the trial court's holding. In its opinion, the trial court quoted section 34-6-103 of the Tennessee Code regarding the effect of acts done by an attorney in fact pursuant to a durable power of attorney, section 314 of the *Restatement (Second) of Agency* entitled restitutional liability, and the seventh edition of Gibson's suits in Chancery regarding the duty of the chancery court "to help those who cannot help themselves." The court followed by stating that "[t]he crucial test is whether a reasonable person would have been placed on notice of the irregularity of the transaction, and knew or should have known that the act complained of was not in the incompetent's best interest." Finally, in dismissing the complaint against Kelcot, the court found that "the sale and conveyance of the real estate to Kelcot Warehouses, L.L.C. was a fair, valid and binding transaction and was expressly authorized by the durable power of attorney." Clearly, the court did not hold that a durable power of attorney will preclude a court's examination of a transaction between an attorney in fact and a third party. According to the trial court's opinion, the court did analyze the transaction and found no irregularity. Therefore, we conclude that Mr. Eaton's first issue is without merit.

Mr. Eaton's second issue is really the crux of his appeal. Mr. Eaton asserts that the facts presented in the present case illustrate that Mr. Kelly worked with Elnora to commit fraud on Mr. Eaton. We cannot agree. The record in this case fails to justify a finding of collusion or fraud committed by Mr. Kelly and Elnora against Mr. Eaton. Further, there is no evidence that Mr. Kelly had notice that Elnora would misappropriate the funds or that Mr. Kelly intentionally assisted Elnora in breaching her fiduciary duty to Mr. Eaton.

Due to his conversations with Mr. Eaton, Mr. Kelly knew that Elnora was authorized to conduct Mr. Eaton's business transactions. Mr. Kelly knew that Elnora's authority extended to conveying Mr. Eaton's realty. By offering to buy Mr. Eaton's farm, Mr. Kelly did not induce Elnora to exceed her scope of authority as Mr. Eaton's agent. Instead, by making the offer to Elnora, Mr. Kelly properly consulted with the only person who had the authority to convey the farm.

The record indicates that $75,000 was a fair price for the farm.[5] Indeed, Mr. Eaton offered the farm to Mr. Kelly for $75,000 on several occasions, the last instance being two to three years before Elnora actually sold the farm to Mr. Kelly. Therefore, Mr. Kelly was without cause to notice any irregularity in the transaction. It would not have appeared to Mr. Kelly that Elnora was acting against the wishes of Mr. Eaton or against Mr. Eaton's best interests. Mr. Kelly's offer simply mirrored the offer that Mr. Eaton gave several times in the past; the offer does not illustrate an intent on the part of Mr. Kelly to take advantage of Mr. Eaton's attorney in fact.

Finally, the record fails to provide evidence that Mr. Kelly had notice that Elnora would misappropriate the funds or that Elnora would breach her fiduciary duty to Mr. Eaton. There is no indication that Mr. Kelly knew how Elnora would spend the proceeds from the sale of the farm. Mr. Eaton argues that Mr. Kelly's stated concern about how Elnora would handle the money, in addition to the lease Mr. Kelly granted to Mr. Eaton, illustrate that Mr. Kelly knew Elnora would breach her fiduciary duty to Mr. Eaton. We cannot agree. The record contains no evidence illustrating that Mr. Kelly expressed concern and leased the farm because of what he knew about Elnora. Mr. Kelly did know, however, that Elnora had cared for Mr. Eaton from 1994 until the date of the conveyance of the farm. We are not prepared to rescind a conveyance of real estate made pursuant to a valid durable power of attorney solely because a third party is concerned about a long time acquaintance or because a third party provides a lease to his seller. There must be more concrete evidence regarding what Mr. Kelly knew, or should have known, about Elnora before we can deem the conveyance voidable. Finally, we must note the trial court's findings regarding Mr. Kelly's knowledge as to Elnora's future actions. The court found that Mr. Kelly was without knowledge that Elnora would misappropriate the funds. The trial court's finding on this matter is not contrary to the preponderance of the evidence. Therefore, pursuant to our standard of review, we decline to reverse the trial court's findings on this issue.

The judgment of the trial court is affirmed. The costs of this appeal are taxed to the appellant, William Isaac Eaton, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[5] In his opening argument, Mr. Eaton's attorney stated that "Mr. Kelly paid a fair sum for the property." Additionally, Mr. Kelly stated that $75,000 was a fair price and there is no evidence to the contrary.