IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2004 Session

# GEORGE HASKEL STEWART v. DEMPLE L. SEWELL, ET AL.

**Appeal from the Chancery Court for Franklin County**
**No. 15,704      Buddy D. Perry, Judge**

---

**No. M2003-01031-COA-R3-CV - Filed April 14, 2005**

---

Plaintiff, stepson of Clara Stewart, contends that attorneys-in-fact of Mrs. Stewart acted in violation of Tenn. Code Ann. 34-6-108(c)(6) and their confidential relationship with Mrs. Stewart, which deprived him of inheriting real property formerly owned by his father under the will of Mrs. Stewart. The attorneys-in-fact (Fiduciaries) are the daughter and son of Mrs. Stewart. They sold the property while their mother was mentally and physically incapacitated, living in a nursing home. The property was sold for substantially less than the appraised value to a daughter and son-in-law of one of the Fiduciaries and two of their friends. Mrs. Stewart, who inherited the property from Plaintiff's father, was the sole owner of the property at the time of the sale. The Fiduciaries, however, invested the proceeds in certificates of deposit with themselves identified as co-owners with Mrs. Stewart with right of survivorship. The Fiduciaries became sole owners of the entire sales proceeds upon the death of Mrs. Stewart. During the administration of Mrs. Stewart's estate, the Fiduciaries, now executors, advised Plaintiff that his devise adeemed by extinction. Plaintiff brought this action to recover the real property or the fair market value thereof from the Fiduciaries and/or the buyers. The trial court dismissed the complaint without making findings, stating only that it was not sustained by the proof. Plaintiff appealed. We reverse finding that the Fiduciaries acted in contravention of the power of attorney and Tenn. Code Ann. 34-6-108(c)(6) and breached their fiduciary duties to Mrs. Stewart, and award Plaintiff a judgment against the Fiduciaries for the net proceeds resulting from the sale of the devised property plus pre-judgment interest from the date of sale.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part, Affirmed in Part and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN, and PATRICIA J. COTTRELL, JJ., joined.

Hudson Owen Maddux, Chattanooga, Tennessee, and John Mark Stewart, Winchester, Tennessee, for the appellant, George Haskel Stewart.

James C. Thomas and Jerre Michael Hood, Winchester, Tennessee, for the appellees, Demple L. Sewell and Bobby L. Judkins (Co-Executors of the Estate of Clara B. Stewart), The Estate of Clara B. Stewart, Robert E. Blocker, Rhonda S. Blocker, Tom A. Paul and Diana L. Paul.

## OPINION

James Stewart was a widower[1] when he married the then Clara Judkins, a widow, in 1974. Both had children from prior marriages. Plaintiff, George H. Stewart, is the son of James Stewart and his first wife. Defendants Demple L. Sewell and Bobby L. Judkins (the "Fiduciaries") are the children of Clara (Judkins) Stewart and her first husband.

During the marriage of James Stewart and Clara (Judkins) Stewart, they both executed wills which were mutual to the limited extent that they each incorporated a devise in each will so that Plaintiff would inherit real estate on Little Hurricane Road that his father, James Stewart had owned since 1939. The property was 6.8 acres and a house on Tims Ford Lake of which 260 feet was valuable lakefront property. In his will, James Stewart devised the property to his wife, Clara Stewart, provided she survived him, and to Plaintiff if she did not. In Clara Stewart's will, the property was also devised to Plaintiff.[2] James Stewart predeceased Clara Stewart, thus she inherited the property.[3]

After the death of James Stewart, Mrs. Stewart executed a new will.[4] Though she made some changes in her estate plan, Mrs. Stewart reaffirmed the intended devise of her deceased husband's property to Plaintiff. Under Mrs. Stewart's new will, the devise to Plaintiff of the property on Little Hurricane Road was identified as "the property formerly owned by James Haskell Stewart." Plaintiff remained the intended devisee of the property at the time of Mrs. Stewart's death.

As Mrs. Stewart's health began to decline, she executed a general durable power of attorney in which she designated her children, Demple L. Sewell and Bobby L. Judkins (the "Fiduciaries"), as her attorneys-in-fact. The power of attorney was executed in November of 1994.

Mrs. Stewart's mental and physical health continued to decline. By January of 1997, Mrs. Stewart needed full time care, thus plans were made to move her into a nursing home. Demple Sewell testified that when the Fiduciaries "went to sign the papers at the nursing home, they told us that [Mrs. Stewart] could keep assets in the – she could keep her home that she had lived in the last five years, $2,000 and a car. Everything else, all her other resources, they wanted a list of them. This is the property, this house, everything was in mother's name, that was her resources. And we had given it to the nursing home. It would have been tied up forever." The Fiduciaries then refused

---

[1] His first wife died in 1971.

[2] Plaintiff was the alternate devisee in the event his father did not survive Mrs. Stewart. In their respective wills, Mr. and Mrs. Stewart each devised the disputed property to each other, provided the other survived. Plaintiff was listed as the alternate devisee under each will. Thus, both Mr. and Mrs. Stewart intended for Plaintiff to be the devisee of the property following the latter of their deaths.

[3] He died on December 30, 1981.

[4] The will was executed in August of 1994.

to sign the financial statement of Mrs. Stewart's assets required by the nursing home. Demple Sewell explained that they refused to do so because "we didn't want to open up the whole thing [Mrs. Stewart's assets]. . . . We were trying to save some portion."

Immediately prior to being admitted to the nursing home, $19,500 that had been in Mrs. Stewart's bank account was "given" to the Fiduciaries, arguably as gifts to her two children. Then, on February 7, 1997, the Fiduciaries, acting as her attorneys-in-fact, sold most of the property James and Clara Stewart had devised to Plaintiff, indeed the most valuable portion, the lakefront property. All that remained was a modest house which was a good distance from the lake. Mrs. Stewart did not authorize or participate in the sale.

The purchasers of the disputed property were Diane Paul, the daughter of Demple Sewell, and her husband Tom Paul, and their friends, Robert and Rhonda Blocker. The appraised value of the property that was sold was $110,000. The purchase price stated in the affidavit of consideration on the deed was a mere $40,000; however, the Fiduciaries, in their answer to the complaint, stated that the true purchase price was $80,000. The property was sold without the assistance of a real estate agent and without public advertising.

The property was solely owned by Mrs. Stewart when it was sold by the Fiduciaries; however, the Fiduciaries deposited the entire proceeds of the sale into certificates of deposit. The Fiduciaries were identified as co-owners with Mrs. Stewart of all of the certificates, with right of survivorship. Mrs. Stewart did not authorize, nor participate, in the manner by which the Fiduciaries deposited or titled the proceeds.

Mrs. Stewart died on May 9, 1998, fifteen months after the Fiduciaries "gifted" the proceeds to themselves by listing themselves as joint owners with right of survivorship. Moreover, none of the proceeds were needed for the care of Mrs. Stewart. Thus, all of the proceeds from the sale of the disputed property remained on deposit at Mrs. Stewart's death. As a consequence, all of the proceeds along with accumulated interest went to the Fiduciaries by right of survivorship.

The Fiduciaries were appointed Co-Executors of Mrs. Stewart's probate estate. During the administration of her estate, the attorney for the Fiduciaries sent a letter to Plaintiff informing him that he had inherited "the house" pursuant to Mrs. Stewart's will. The key to the house was enclosed. No mention was made of the disputed property that adeemed by extinction due to the sale orchestrated by the Fiduciaries or the proceeds the Fiduciaries received upon the death of Mrs. Stewart.[5]

---

[5] "Ademption" has been defined as "the extinction, alienation, withdrawal, or satisfaction of the legacy *by some act of the testator by which an intention to revoke is indicated*; the doing of some act with regard to the subject matter which interferes with the operation of the will." (emphasis added) *Pritchard on Wills and Administration of Estates*, § 486 (Jack W. Robinson, Sr. & Jeff Mobley, 5th ed. 1994).

Thereafter, Plaintiff filed this action seeking to recover the property, or a constructive trust and/or damages resulting from the Fiduciaries' acts in contravention of the power of attorney and Tenn. Code Ann. § 34-6-108(c)(6) and the breach of their fiduciary duties. Plaintiff contended that he would have inherited the disputed property but for the *ultra vires*, self-serving acts by the Fiduciaries. He asserted that he was deprived of inheriting the disputed property, or the value thereof, as a direct result of the Fiduciaries' actions. Defendants denied they violated any fiduciary duties and contended that Plaintiff was entitled to no relief.

At the conclusion of a lengthy bench trial, the trial court requested counsel to submit proposed findings of fact and conclusions of law. The trial judge went on to explain:

> I'm going to give you some impression so you all can just kind of see what I've gotten out of what we've done so far. I like things put in the context of an issue or issues. I'm not sure I've heard what either side thinks the issue or issues are in this case. We've just kind of thrown things around. Factually, it doesn't look like the facts are terribly complicated. We've got a Will with two specific requests; one for Mrs. Stewart and one for the children of Mrs. Stewart. Then you've got the Power of Attorney executed by making her children attorney in fact. And they dispose then of some of the property a portion of which would have been a part of this specific request [sic] to Mr. Stewart.
> Now, we've got to frame an issue around that very simple set of facts, and I haven't had time to think about this much. It looks to me and I want you folks, you all can do this much better than I can, I know you can but it looks like we're dealing with an issue in this case of the attorneys in fact who are also beneficiaries of specific request [sic] under a Will or a fiduciary obligation to others who are also beneficiaries of the specific request [sic] to either preserve the subject property of the specific request [sic] or to, and/or dispose of the property equally. That looks to me like that's sort of the legal issue we're dealing with here; maybe it can be stated more precisely than what I said there but that seems to be – that seems to be the question. And then if there is that fiduciary obligation, has it been violated in this case? And maybe as a corollary if the attorneys in fact are acting in good faith, can a resulting or constructive trust and I never know which is the right word to use there but can a resulting or constructive trust follow the funds so that Mr. Stewart could benefit from that? The facts aren't too terribly complicated. Stating and understanding the legal issues are a little more complicated at least they are for me. So if you folks would first frame some issues so I can understand them and I don't have any particular concern about the time other that [sic] I want you to, whatever you tell me you're going to do I want an agreement we're going to do it.

> \* \* \* \*

> [I]t's better for people involved in litigation particularly this kind of litigation probably to hear a judge rule from the bench and say here's what I'm doing and here's why.

But I hope you all understand that this is [sic] not exactly simple issues here. They are a little more complicated and I need the benefit of the lawyers giving me some information and I'll write an opinion so that everybody would be able to read it. At least half of you won't agree with what it says but you'll have the opportunity to read it and draw your own conclusions about whether I'm correct or not correct and I'll try to do that within a reasonable time as well.

Unfortunately, trial counsel did not comply with the court's request. While they submitted letters to the court summarizing the evidence and additional authorities supporting their positions, they did not identify the issues and they did not submit findings of fact or conclusions of law.

At the conclusion of the bench trial, the trial judge indicated that he would write an opinion after receiving the requested input from counsel. We do not, however, find a memorandum opinion in the record. Moreover, we do not find where the trial court made any findings of facts or conclusions of law.[6] The order that followed merely stated, in pertinent part, that "the Complaint heretofore filed by the original plaintiff, George Haskel Stewart, is not sustained by the proof and is hereby dismissed with prejudice."

## Issues

This case presents several important issues and in order to address them in a systematic manner, we have chosen to recast the issues and will address them in the following order. Did the Fiduciaries engage in activities in contravention of the power of attorney and the limitations imposed on attorneys-in-fact under Tenn. Code Ann. § 34-6-108(c)(1) and (6)? Did the Fiduciaries engage in a transaction whereby they received a benefit in violation of their fiduciary duties to Mrs. Stewart? Does Plaintiff have standing to complain of the Fiduciaries malfeasance, if any? If so, what remedy or remedies are available?

## Standard Of Review

If the trial court makes specific findings of fact, we review the record *de novo* and presume that the findings of fact are correct unless the preponderance of the evidence is otherwise, and give great weight to a trial court's determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G* Constr*., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

---

[6]This is likely due to the fact that counsel failed to submit "findings of fact" or "conclusions of law" as the trial judge had requested.

Our review of a trial court's determinations on issues of law is *de novo*, with no presumption of correctness. *Frye v. Blue Ridge Neuroscience Center, P.C.*, 70 S.W.3d 710, 713 (Tenn. 2002); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

## Power of Attorney

We shall first determine whether the Fiduciaries engaged in activities in contravention of the power of attorney and the limitations imposed on attorneys-in-fact under Tenn. Code Ann. § 34-6-108(c)(1) and (6).

The relationship between an attorney-in-fact and the principal is subject to the laws of agency. *See Kerney v. Aetna Cas. & Sur. Co.*, 648 S.W.2d 247, 252 (Tenn. Ct. App. 1982) (quoting *Howard v. Haven*, 281 S.W.2d 480-485 (1955)) (stating that "[a]gency in its broadest sense includes every relation in which one person acts for or represents another."); 3 Am.Jur.2d Agency § 23 (1986) (stating that "[i]n many respects, questions concerning agents holding powers of attorney are substantially the same as those governing agents generally."). Acts performed by an attorney in fact pursuant to a durable power of attorney "during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal . . . as if the principal were competent and not disabled." Tenn. Code Ann. § 34-6-103. Thus, acts done by an attorney in fact will bind the principal while under a period of disability or incapacity. It therefore follows that one acting pursuant to a durable power of attorney must act in the principal's best interests and within the scope of authority granted by the statute and the principal. One acting pursuant to a durable power of attorney must act in the principal's best interests and within the scope of authority granted by the statute and the principal. *Eaton ex rel. Johnson v. Eaton*, 83 S.W.3d 131, 134 (Tenn. Ct. App. 2001).

The power of attorney Mrs. Sewell granted unto the Fiduciaries, Demple Sewell and Bobby Judkins, provided in pertinent part the right and power to:

Ρ "transact any banking business with any banking institution on [Mrs. Sewell's] behalf"

Ρ "sell both real and personal property on [Mrs. Sewell's] behalf"

Ρ "execute deeds and other instruments conveying personal and real property"

Thus, the Fiduciaries had the express authorization from Mrs. Sewell to transact her banking business and to sell her real property, as well as to execute deeds therefor. Such a grant of power is broad; however, certain limitations are imposed by Tenn. Code Ann. § 34-6-108(c) unless the principal clearly states a contrary intention in the power of attorney. Two statutory limitations relevant to the facts at issue are found in subsections (1) and (6) of Tenn. Code Ann. § 34-6-108(c). They provide that unless Mrs. Stewart clearly expressed a contrary intention within the power of attorney, the Fiduciaries were *not* vested with authority to exercise any of the following powers:

(1) Make gifts, grants, or other transfers without consideration, except in fulfillment of charitable pledges made by the principal while competent.

. . . .

(6) Change, add or delete any right of survivorship designation on any property, real or personal, to which the principal holds title, alone or with others.

Tenn. Code Ann. § 34-6-108(c). Therefore, unless Mrs. Stewart clearly expressed such an intention within the power of attorney, the Fiduciaries were *not* vested with authority to make gifts or other transfers without consideration (except in fulfillment of charitable pledges made while competent), or change or add any right of survivorship designation on any property to which Mrs. Stewart held title.

Mrs. Stewart's power of attorney was a typical general durable[7] power of attorney. Like most powers of attorney, it did not grant such powers to the Fiduciaries. Thus, due to the absence of such intention in the power of attorney combined with the limitation imposed by Tenn. Code Ann. § 34-6-108(c)(1) and (6), it is abundantly clear that the Fiduciaries did not have the power to change the title of the disputed property, which was solely in Mrs. Stewart's name when sold, or to bestow upon anyone, especially themselves, joint ownership or the right of survivorship. While they had the authority, assuming it was in Mrs. Stewart's best interest, to sell the property, they had a corresponding duty to invest the proceeds in assets or accounts solely in the name of Mrs. Stewart because the property was titled solely in her name when it was sold.

Accordingly, the Fiduciaries acted in direct contravention of the power of attorney and Tenn. Code Ann. § 34-6-108(c)(1) and (6) by depositing the proceeds in a series of certificates of deposit with themselves identified as co-owners and with right of survivorship upon the death of Mrs. Stewart.

### Confidential Relationship

Confidential relationships can assume a variety of forms and courts have been hesitant to precisely define a confidential relationship. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, a confidential relationship is any relationship which gives a person dominion and control over another. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Turner v. Leathers*, 232 S.W.2d 269, 271 (Tenn. 1950); *Roberts v. Chase*, 166 S.W.2d 641, 650 (Tenn. Ct. App. 1942). It is not merely a relationship of mutual trust and confidence, but rather a confidential relationship is one where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to exercise dominion and control over the weaker or dominated party. *Iacometti v. Frasinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973). A confidential relationship is created when one person has dominion and control over another. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (citation omitted). It is

---

[7]A "durable" power of attorney survives the incapacity and mental incompetency of the principal. Tenn. Code Ann. 34-6-102.

important to recognize that the mere existence of a confidential relationship is not a suspicious circumstance *per se*. The courts are concerned not with confidential relationships but with *the abuse of such relationships*. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). (emphasis added)

The relations between family members and relatives are not, in and of themselves, confidential relationships. *Halle v. Summerfield*, 287 S.W.2d 57, 62 (Tenn. Ct. App. 1983); *Harper v. Watkins*, 670 S.W.2d 611, 628 (Tenn. Ct. App. 1983). However, fiduciary relationships such as guardian and ward, attorney and client, and conservator and ward are. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Parham v. Walker*, 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978); *Roberts v. Chase*, 166 S.W.2d 641, 650 (Tenn. Ct. App. 1942); see also 1 Pritchard on the Law of Wills and Administration of Estates §§ 132-137 (4th ed. 1983); *Mitchell v. Smith*, 779 S.W.2d 384, 388-389 (Tenn. Ct. App. 1989).

An attorney-in-fact with general powers is an agent of the principal. *See Childress*, 74 S.W.3d 324. The relationship between the agent and principal is fiduciary in nature and generally treated with the same gravity and strictness as the trustee-beneficiary relationship. *Marshall v. Sevier County*, 639 S.W.2d 440, 446 (Tenn. Ct. App. 1982). An agent, as a fiduciary, is under a duty of loyalty to the principal. *Pridemore v. Cherry*, 903 S.W.2d 705, 707 (Tenn. Ct. App.1995) (citing *Gay & Taylor, Inc. v. Am. Cas. Co.*, 381 S.W.2d 304, 305 (Tenn. Ct. App. 1964)). Accordingly, in matters connected with the agency, the agent must serve only the principal; the agent cannot act for themselves or in the interests of others. *Heard v. Miles*, 222 S.W.2d 848, 851 (Tenn. Ct. App. 1949). An agent is a fiduciary with respect to matters within the scope of the agency and the relationship implies the principal has reposed trust and confidence in the agent, who is bound to exercise the utmost good faith, loyalty and honesty toward the principal. *See Knox-Tenn Rental Co. v. Jenkins Ins.*, 755 S.W.2d 33, 36 (Tenn. 1988); *Roberts v. Iddins* 797 S.W.2d 615, 617 (Tenn. Ct. App. 1990).

The burden of proof regarding a confidential relationship initially rests upon the party claiming the existence of such relationship. *Childress*, 74 S.W.3d at 328 (citation omitted). The Fiduciaries are the daughter and son of Mrs. Stewart, yet such a relationship does not, in and of itself, constitute a confidential relationship. *See Halle*, at 62. The existence of a close family relationship, however, does not preclude the presumption from taking effect when suspicious circumstances exist. *Hamilton*, 67 S.W.3d 786, 795 (Tenn. Ct. App. 2001). The Fiduciaries, however, are also the attorneys-in-fact for their mother and they exercised those powers to sell realty and to transact business at the bank. Thus, a confidential relationship existed from the exercise of the power of attorney. *See Childress*, 74 S.W.3d at 329.

It is undisputed that the power of attorney Mrs. Stewart granted unto the Fiduciaries is a general and durable power of attorney. Tenn. Code Ann. § 34-6-102 defines a durable power of attorney as a "power of attorney by which a principal designates another as the principal's attorney in fact in writing . . . showing the intent of the principal that the authority conferred shall be exercisable, notwithstanding the principal's subsequent disability or incapacity." Tenn. Code Ann. § 34-6-102 (1983). Thus, the Fiduciaries had the power to act on behalf of Mrs. Stewart not only

without her consent or participation while she was competent; they also had such power after she lost her capacity to consent – or object – to the Fiduciaries' actions. Thus, acts by the Fiduciaries while Mrs. Stewart was incapacitated did not require the consent or participation of Mrs. Stewart. Accordingly, it was not necessary for the Fiduciaries to "unduly influence" Mrs. Stewart to sell the disputed property. Moreover, it was not necessary for the Fiduciaries to "unduly influence" Mrs. Stewart to create the bank accounts with themselves as co-owners with right of survivorship. They had the authority to sell her property and transact her banking business without her knowledge, consent or participation. The Fiduciaries engaged in conduct consistent with the popular advertising slogan of a sport apparel company – "Just Do It" – and indeed they "did it" without Mrs. Stewart's knowledge, consent or participation.

The Fiduciaries were acting in the capacity as agents for Mrs. Stewart. An agent, such as an attorney-in-fact, is a fiduciary with respect to matters within the scope of the agency for which the principal has reposed trust and confidence in the agent. Thus, they were bound to exercise the utmost good faith, loyalty and honesty toward Mrs. Stewart. *See Knox-Tenn. Rental Co. v. Jenkins Ins.*, 755 S.W.2d 33, 36 (Tenn. 1988); *see also Roberts v. Iddins*, 797 S.W.2d 615, 617 (Tenn. Ct. App. 1990).

As the Fiduciaries were preparing to move Mrs. Stewart into the nursing home in December of 1996 and January of 1997, the Fiduciaries received a $19,500 "gift" from Mrs. Stewart's bank account. One of the Fiduciaries, Demple Sewell, facilitated the $19,500 "gift" to herself and her brother. Shortly thereafter, the Fiduciaries proceeded to sell the disputed property valued at $110,000. They sold it to her daughter, son-in-law and two friends for $80,000[8] and deposited the proceeds into certificates of deposit. Though Mrs. Stewart was the sole owner of the disputed property, the Fiduciaries established the new accounts with themselves as co-owners with Mrs. Stewart, with right of survivorship. The proceeds were never used for Mrs. Stewart's benefit because other assets were sufficient to provide for her care and nursing home expenses.

The Fiduciaries claimed they were acting in good faith and that they used their best discretionary judgment to provide for their mother when they used the power of attorney to sell the disputed property and establish new accounts at the bank. Demple Sewell testified that the sale was intended to prevent the property from "going to the nursing home." She also testified that she did not "want to open up the whole thing" by signing the financial statement that would give her mother's property to the nursing home and that her mother's property "would have been tied up forever" if they had signed the financial statements. There are, however, several problems with their "explanation." One is that the proceeds from the sale of the property at issue was not needed to provide for their mother. A more significant problem is that the Fiduciaries gifted the proceeds to themselves by depositing them in a joint account with the right of survivorship. The fact of the matter is that it was wholly unnecessary to deposit the proceeds into a joint account. This is because the general power of attorney afforded the Fiduciaries the authority to access the funds if and when needed for their mother's benefit. Placing the proceeds in a joint ownership account provided

---

[8]The deed represented that the sales proceeds were only $40,000.

absolutely no benefit to their mother. Moreover, designating themselves as the survivors to the funds at the death of their mother provided absolutely no benefit to their mother. The banking transactions only served one purpose, gifting the proceeds from the sale of the disputed property to the Fiduciaries.

The facts before us bear a striking resemblance to those in *Estate of Glasgow v. Whittum*, 106 S.W.3d 25 (Tenn. Ct. App. 2002). In *Whittum*, this court was called upon to determine whether there was material evidence to support the verdict that Virgil Whittum violated his fiduciary duties arising out of a confidential relationship by using a power of attorney to sell the principal's real estate and to deposit the proceeds in his own bank account. The record showed that Virgil Whittum used the power of attorney to sell real estate belonging to the principal, Alline Glasgow, at less than its appraised value. It further showed that he promptly deposited the proceeds of the sale in the joint bank account of Virgil Whittum and Norma Jean Biggs Whittum. *Id.* at 28-29. This court held that these actions, while not conclusive, clearly triggered a charge to the jury as to the presumption of undue influence as stated in *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn.1995). While *Whittum* was pending on appeal, our Supreme Court rendered its opinion in *Childress v. Currie*, restricting the scope of the *Matlock* presumption to exclude an "unexercised" power of attorney.[9] *Childress*, 74 S.W.3d at 329. The restriction was inapplicable to *Whittum* since Virgil Whittum had exercised the power of attorney to dispose of Mrs. Glasgow's major asset and deposit the proceeds in the joint account benefitting himself. Because the burden of proof shifted to Virgil Whittum, he was required to establish clear and convincing evidence to rebut the presumption. *Whittum,* at 28-29.

The facts before us also has similarities to another case this court considered. *In re Conservatorship of Groves*, 109 S.W.3d 317 (Tenn. Ct. App. 2003). Glendon Groves contended on appeal that the trial court erred by ordering him to return the proceeds of a $100,000 certificate of deposit his sister-in-law, Mrs. Ellen Groves and her late husband, R. C. Groves, had maintained at a bank in Dickson. The appellant contended that the proceeds of the account were "gifted" to him. The "gift" was made while R. C. Groves was in the hospital and facing a lengthy convalescence from which he might never return home. Three days after the alleged gift, R.C. Groves was admitted to a nursing home and he and his wife executed powers of attorney naming Glendon Groves as their attorney-in-fact. Around the same time, Glendon Groves facilitated the transportation of Mrs. Groves to the offices of the Department of Human Services for her to apply for food stamps, Medicaid and TennCare benefits. She qualified for all benefits and her husband qualified for TennCare benefits. *Id.* at 323. This court found the contention without merit for two reasons. One, the evidence supported the trial court's conclusion that Mr. Groves exerted undue influence on his brother and sister-in-law to obtain this money. Two, public policy prevented Mr. Groves from keeping the funds because the purported gift was part of a fraudulent scheme to qualify Mrs. Groves and her late husband for governmental benefits to which they were not entitled. *Id.* at 352.

---

[9]"The issue of undue influence should 'be decided by the application of sound principles and good sense to the facts of each case.'" *Id*. at 388 (*quoting Halle v. Summerfield*, 199 Tenn. 445, 454, 287 S.W.2d 57, 61 (1956)). A careful reading of *Matlock* and *Mitchell* shows that an unexercised power of attorney does not in and of itself create a confidential relationship and we clarify *Matlock* to the extent it suggests otherwise." *Childress,* 74 S.W.3d at 329.

The court found that Mr. Groves's relationship with his brother and sister-in-law became a confidential relationship even before they gave him the unrestricted powers of attorney in April 1994. Prior to that time, Ms. Groves and her late husband had become physically disabled and were relying increasingly on Mr. Groves to assist them with their financial affairs. Ms. Groves's husband, who had always been in charge of their finances, had been hospitalized with a serious illness and was facing a lengthy and expensive stay in a nursing home. Based on these facts, the court held that the evidence supported the trial court's conclusion that Glendon Groves was in a position to exert undue influence on both his brother and sister-in-law prior to the "gift." *Id*. at 352. The court further stated:

> Mr. Groves obtained the proceeds from the $100,000 certificate of deposit while his brother was still hospitalized and after his brother learned that he was going to be admitted to a nursing home. He took an active role in seeing to it that Ms. Groves surrendered the certificate of deposit and delivered the proceeds to him. This transaction substantially depleted his brother's and sister-in-law's life savings. There was no consideration for the transaction, and, according to Mr. Groves, his brother and sister-in-law placed no restrictions on his use of the money. (footnote omitted) However, Mr. Groves now claims that he told his brother that he "would keep it [the money] to have for them in case they needed it."

> Receiving the proceeds of the $100,000 certificate of deposit substantially benefitted Mr. Groves. Even if we were to accredit his self-serving testimony that he planned to use this money to benefit his brother and sister-in-law, he did not anticipate being required to use much of these funds because the plan was to use government benefits to defray most of their expenses. In light of the nature of the relationship between Mr. Groves and his brother and sister-in-law when he received these funds, Mr. Groves had the burden of proving by clear and convincing evidence that this transaction was fair. *Childress v. Currie*, 74 S.W.3d at 328; *Fell v. Rambo*, 36 S.W.3d at 847-48. Rather than establishing the fairness of the transaction, Mr. Groves's testimony, taken with the other evidence in the case, establishes that the transaction was entirely unfair and was, in fact, fraudulent.

*Groves*, 109 S.W.3d at 352-353.

The Fiduciaries benefitted from the transaction. Though her admission is unnecessary to prove the obvious fact, Demple Sewell acknowledged that she and her brother received a personal benefit from the certificates of deposit they established. A "presumption of undue influence arises where the dominant party receives a benefit from the other party." *Estate of Hamilton*, 67 S.W.3d at 793. The presumption of undue influence is overcome only where the dominant party can show by clear and convincing evidence that the transaction was fair. Thus, the burden of proof shifted and the Fiduciaries were required to prove that the transaction was fair to Mrs. Stewart pursuant to the clear and convincing standard. For evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992); *O'Daniel v. Messier*, 905

-11-

S.W.2d 182, 188 (Tenn. Ct. App. 1995). Such evidence should produce a firm belief as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as distinguished from "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992).

The Fiduciaries' attempts to explain their actions were wholly unconvincing. For that matter, their testimony was essentially incredible. Instead of proving the propriety of their actions, the evidence established the converse, that the Fiduciaries intentionally used the power of attorney to benefit themselves by gifting the proceeds from the sale of the disputed property to themselves. Moreover, the Fiduciaries' actions exposed Mrs. Stewart to various liabilities for potential fraud upon the Medicaid and TennCare programs.[10] Such actions constitute serious violations of the Fiduciaries' duties to exercise the utmost good faith, loyalty and honesty toward Mrs. Stewart. Thus, we hold that the Fiduciaries, Demple Sewell and Robert Judkins violated their confidential relationship and breached their fiduciary duties owing to Mrs. Stewart when they established the certificates of deposit.

### Plaintiff's Remedies

We have determined that the Fiduciaries acted in contravention of the power of attorney and the limitations imposed under Tenn. Code Ann. § 34-6-108(c)(1) and (6) and breached their fiduciary duties. We must now determine Plaintiff's remedies for the Fiduciaries *ultra vires* acts and malfeasance.

Typically, an action to rescind a transaction is filed by the grantor or by the grantor's guardian or conservator if the grantor is incapacitated. *See York v. Georgia-Pacific Corp.*, 585 F.Supp. 1265, 1276-77 (D.C. Miss. 1984) (permitting suit by the grantor or his heirs to bring an action to rescind a deed if the grantor is incapacitated); *see also Loftis v. Johnson*, 294 S.E.2d 511, 512 (Ga.1982) (permitting suit by the grantor's guardian). A third party who is a stranger to the transaction is seldom able to complain. There are, however, exceptions. One such exception is when the party can demonstrate an adverse effect on its legal or equitable rights. *ADCA Corp. v. Blumberg*, 403 So.2d 547, 547 (Fla. Dist. Ct. App.1981); *City of Bluefield v. Taylor*, 365 S.E.2d 51, 55 (W. Va.1987). We find that Plaintiff has at least two remedies. They are discussed below.

---

[10]Statutes governing Medicaid and TennCare programs recognize that persons seeking benefits may attempt to impoverish themselves to qualify for benefits and the statutes provide remedies for such conduct. Persons applying for benefits must not only disclose the assets in their possession when they apply, but they must also disclose all transfers of assets within thirty-six months prior to an application for benefits. 42 U.S.C.A. § 1396p(c)(1)(B)(i) Any person who fails to disclose transfers of assets for less than fair market value occurring after the "look back" date is subject to losing benefits for a defined period, and may be subject to criminal prosecution if the failure to disclose the transfer is intentional. Tenn. Code Ann. § 71-5-118(b)(1)(A).

## Constructive Trust

A constructive trust is viewed as "the formula through which the conscience of equity finds expression." These are the words of Judge Cardozo in *Beatty v. Guggenheim Exploration Co.*,122 N.E. 378, 380, 225 N.Y. 380, 386 (N.Y. Ct. App. 1919). He further opined that equity works through a constructive trust "when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." *Id.* Some element of fraud, concealment, duress, etc., such that a person has obtained property "which he ought not, in equity and good conscience, hold and enjoy" is required for a constructive trust. *Roach v. Renfro*, 989 S.W.2d 335, 340-341 (Tenn. Ct. App. 1998).

In Tennessee, a constructive trust may be imposed where: (1) a person procures the legal title to property in violation of a duty to the actual owner; (2) the title to property is obtained by some inequitable means; (3) a person makes use of some influence in order to obtain title on better terms than it otherwise would have been obtained; (4) a person acquires property with notice that someone else is entitled to its benefits. *Estate of Queener v. Helton*, 119 S.W.3d 682, 687 (Tenn. Ct. App. 2003); *see also Tanner v. Tanner*, 698 S.W.2d 342, 345-346 (Tenn.1985).

The issue of a constructive trust was at the center of a recent controversy before this court, *State ex rel. Paula Flowers v. Tennessee Coordinated Care Network, et al.*, No. M2003-01658-COA-R3-CV, 2005 WL 427990 (Tenn. Ct. App. Feb. 23, 2005). In that matter, Tennessee Coordinated Care Network (TCCN), a TennCare managed care organization, transferred $5.7 million to a company that provided management services. The transfer, however, was in direct violation of a statutory Notice of Administrative Supervision. Pursuant to the Notice, the State of Tennessee had forbade TCCN from transferring any of its assets. Both TCCN and the management company to which the funds were transferred knew of the prohibition; nevertheless, the funds were transferred to the management company. Shortly thereafter, the management company filed for bankruptcy protection.[11] The State of Tennessee made a claim of constructive trust, arguing that the funds were wrongfully transferred, thus the management company (now its bankruptcy estate) was holding the funds as constructive trustees. The bankruptcy court lifted the automatic stay and allowed the Chancery Court of Davidson County to determine whether a constructive trust existed. The Chancellor found a constructive trust existed. On appeal, this court affirmed relying in part on two bankruptcy opinions that hinged on the issue of constructive trust, *XL Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir. 1994) and *Kitchen v. Boyd (In re: Newpower)*, 233 F.3d. 922 (6th Cir. 2000). Though the matter at bar has nothing to do with bankruptcy law, the opinions are relevant to the constructive trust issue. A brief discussion is in order.

*Omegas* and *Newpower* each involved a transfer of assets and the efforts of a third party to recover the transferor's assets via a constructive trust. *Omegas* held that it was inappropriate to allow one creditor to jump ahead of other creditors via a constructive trust theory when the transfer

---

[11]Within hours of the wrongful transfer of the funds to the management company, the funds were again transferred, this time to the management company's parent company. Both companies then filed for bankruptcy protection after which the State of Tennessee made claims of constructive trust against both.

at issue was in the ordinary course of business. *Newpower*, which was decided thereafter and had many similarities, reached a contrary result based on one significant dissimilarity that is relevant to the case at bar. The majority in *Newpower* explained the distinction that justified the different result, stating:

> *In re Omegas* dealt with a situation wherein the debtor obtained property from a creditor *in the ordinary course of business*. There was no question that the debtor had legal title; the creditor intended such title to pass to the debtor. The debtor also had a colorable claim as to the equitable title in the property at issue. The question in *In re Omegas*, and the other cases cited therein, was whether some fraudulent or other bad act of the debtor in the course of those business dealings justified the bankruptcy court in stripping the debtor of the equitable title in the property. We held that it was not the province of the bankruptcy court to impose a constructive trust, but we were not faced with the question of either obtaining or enforcing a state court judgment holding that the equitable interest belonged to someone other than the debtor. *See In re Omegas*, 16 F.3d at 1450. (emphasis added)

> The situation presented by *this case is significantly different. Here, Newpower is a thief. . . .* To hold as Judge Kennedy would, that the lifting of the stay serves no purpose because *In re Omegas* precludes the enforcement of a constructive trust impressed by the state court under the circumstances of this case, and that here bare legal title is sufficient to bring this properly [sic] entirely within the bankruptcy estate is to permit a result clearly prohibited by the Bankruptcy Code. See 11 U.S.C. § 541(d). Furthermore, *to preclude the Kitchens* from continuing their state court action to determine their equitable interest in the property *would allow a thief, such as Newpower, unilaterally to convert stolen funds*, in which the debtor has no title, into property of the bankruptcy estate simply by purchasing goods from an unknowing seller. (emphasis added)

*Newpower* at 935-936.

The distinction between *Newpower* and *Omegas* was relevant to TCCN and is relevant here because the transfer was unlawful. Finding the *Newpower* reasoning convincing, this court imposed a constructive trust because TCCN was under a Notice of Supervision that expressly prohibited any transfer of assets, yet in violation of its responsibilities TCCN transferred assets. This court found TCCN's unlawful conduct sufficient to impose a constructive trust. Moreover, this court imposed the constructive trust effective the date the assets were wrongfully transferred.

Here, the Fiduciaries unlawfully transferred the proceeds from the sale of the devised property to themselves. Applying the equitable rationale of *Newpower* and TCCN, we find that a constructive trust should be imposed on the proceeds of the sale of the realty, with the effective date of the constructive trust being the date of the sale, along with interest that has accrued.

-14-

<u>The *Foster Hume* "in specie" Doctrine meets the Unfaithful, Self-Serving Fiduciary</u>

Plaintiff would have inherited the devised property but for the *ultra vires* and self-serving acts of the Fiduciaries. The devise at issue was specific and the devised property was not owned by Mrs. Stewart at her death. Tennessee is an "in specie" ademption by extinction state, meaning the devise is adeemed if the specific devise is not owned by the testator at her death. The foremost case espousing this doctrine is *In re Estate of Hume*, 984 S.W.2d 602 (Tenn. 1999). However, whether *Hume* applies when an unfaithful fiduciary's *ultra vires* actions are self-serving has not been considered in this state.

This case presents an irreconcilable conflict between Tennessee's "no exceptions" ademption by extinction doctrine with the "in good faith" duties of an attorney-in-fact. *In re Estate of Hume*, 984 S.W.2d 602, 604 (Tenn. 1999) stands for a "no exceptions" ademption by extinction doctrine. As the court explained, "it only matters that the subject of the specific bequest no longer exists because of 'the doing of some act;' it is irrelevant who or what initiates 'the doing.'" *Hume* at 604 (citing *American Trust & Banking Co. v. Balfour*, 198 S.W. 70, 71 (Tenn. 1917)). Yet, it is universally recognized that an attorney-in-fact stands in a fiduciary relationship to his principal and is under a duty to be careful, skillful, diligent and loyal in the performance of his principal's business and that for a failure so to act he subjects himself to liability to his principal for any damages naturally and proximately flowing from the breach of duty. See 3 Am.Jur.2d, Agency, Sections, 204, 205; 3 C.J.S. Agency §§ 268, 271, 273, 276; 2 Restatement Agency, Sections 379, 387, 399.

Taking *Hume* to the extreme, it matters not if a fiduciary deliberately and unlawfully violated their fiduciary duties of utmost good faith or exceeded the scope of their authority and lined their pockets with $80,000 of the principal's (testator's) assets; if it is adeemed, it is adeemed. Applying the no exceptions doctrine would open the floodgates for disloyal fiduciaries, such as ours, to do as they please, to pervert the intentions of the testator while lining their own pockets in the process. Yet, *Hume* was not confronted with a breach of fiduciary duties. It is this substantial distinction that removes the case at bar from the "no exceptions" doctrine espoused in *Hume*. Let us explain our reasoning.

"Ademption by extinction results because of 'the doing of some act with regard to the subject-matter which interferes with the operation of the will.'" *Hume* at 604 (quoting *Balfour*, 198 S.W. at 71). As the *Hume* court put it, the rule of ademption by extinction

> is predicated upon the principle that the subject of the gift is annihilated or its condition so altered that nothing remains to which the terms of the bequest can apply. *Wiggins v. Cheatham*, 143 Tenn. 406, 225 S.W. 1040, 1041 (1920) (citation omitted). In other words, it only matters that the subject of the specific bequest no longer exists because of "the doing of some act;" it is irrelevant who or what initiates "the doing." *Balfour*, 198 S.W. at 71.

*Id*. at 604. The issue in *Hume* was whether a specific devise of the real property to his niece, Meredith Klank, was adeemed in its entirety by the foreclosure sale that occurred prior to Mr.

Hume's death. The *Hume* court principally relied on two cases, *Balfour,* 198 S.W.70 (Tenn. 1917) and *Ford v. Cottrell*, 207 S.W. 734 (Tenn. 1918). The *Hume* court noted, "Much like the specific bequest in *Ford*, at Hume's death, "the specific property in question ha[d] been sold . . . and [i]s not, therefore, in existence." *Ford* at 737. The only difference between the sale in *Ford* and the sale in *Hume* was the identity of the seller. In *Ford*, the testator himself sold the devised property prior to his death. In *Balfour,* the testator bequeathed life insurance proceeds to his daughter, but prior to his death the testator collected the cash surrender values of the policies and invested in real estate mortgage notes. The *Ford* and *Balfour* courts found an ademption by extinction, each of which resulted from an affirmative act by the testator. *Hume* at 605.

*Hume* held that it was of no significance that a third party – the trustee under a deed of trust – effected the sale. The foreclosure sale constituted "the doing of some act with regard to the subject-matter which interferes with the operation of the will." *Hume* at 605 (quoting *Balfour*, 198 S.W. at 71) Accordingly, *Hume* held the foreclosure sale adeemed the specific devise. *Hume* at 605.

The facts before this court are very different from *Hume, Balfour* and *Ford*. The disposition of Mrs. Stewart's asset was not the result of an act by the testatrix and it was not the result of a lawful act of a third party. To the contrary, the disposition of Mrs. Stewart's asset resulted from the disloyal and self-serving acts of her fiduciaries. Moreover, the Fiduciaries were beneficiaries of the rest and residue of Mrs. Stewart's estate and therefore additionally benefitted by the decision to sell the only property they would not inherit. Accordingly, we can only conclude that *Hume* can be, indeed, must be, distinguished and therefore *Hume* is not controlling.

One of the bases for the no exceptions rule for ademption by extinction stated in *Hume* was the need for stability, uniformity, and predictability.

> This rule that the intent of the testator is irrelevant in ademption by extinction cases is in harmony with the modern holdings found in the majority of states. *E.g., McGee v. McGee*, 122 R.I. 837, 413 A.2d 72 (R.I.1980). In *McGee*, the Rhode Island Supreme Court defines the rule and persuasively analyzes the policy supporting it. The *McGee* court stated with respect to the "in specie" test:
>
> > This test focuses on two questions only: (1) whether the gift is a specific legacy and, if it is, (2) whether it is found in the estate at the time of the testator's death. The extinction of the property bequeathed works an ademption regardless of the testator's intent.
>
> * * * *
>
> [O]nly the fact of change or extinction, not the reason for the change or extinction, is truly relevant. The vast majority of jurisdictions adhere to this rule. This "in specie" theory of ademption, although it may occasionally result in a failure to effectuate the actual intent of a testator, has many advantages. *Significant among these advantages is simplicity of application, as opposed to ad hoc determination of*

*intent from extrinsic evidence in each particular case. This theory further has the advantages of stability, uniformity, and predictability.* (emphasis added)

*Id.* at 605 (quoting *E.g., McGee v. McGee*, 122 R.I. 837, 413 A.2d 72, 76-77 (citations omitted).

The principal difference between *Hume* and the case at bar is that Mr. Hume, the testator, encumbered the property. Thereafter, Mr. Hume failed to satisfy the mortgage and as a result the property was foreclosed. Thus, the extinction of the specific devise was the direct result of the acts and omissions of Mr. Hume; he encumbered the devise and he failed to satisfy the debt. Here, Mrs. Stewart played no part in the extinction of the devised property. To the contrary, her fiduciaries caused the ademption by acting in violation of their fiduciary duties and in direct contravention of the power of attorney and Tenn. Code Ann. § 34-6-108(c)(1) and (6) when they sold the property and invested the proceeds in accounts they owned.

Paraphrasing *Newpower*, to preclude Plaintiff from continuing his action to determine the equitable interest in the property would allow a thief to unilaterally convert funds in which they previously had no title. *Newpower* at 936.

Chief Justice Drowota provided an excellent discussion of the duties and liability of a fiduciary in *Grahl v. Davis*, 971 S.W.2d 373, 377-78 (Tenn. 1998). *Grahl* pertained to the actions of a conservator. While the authority and responsibility of a conservator is not identical to that of an attorney-in-fact (the authority of a conservator is statutory while the authority of an attorney-in-fact principally arises from the power of attorney) their responsibilities are substantially the same as it pertains to inducements to neglect the ward or principal to whom they owe a fiduciary duty and especially *the fiduciary duty to not acquire property of the principal*. As Chief Justice Drowota stated it,

> The purpose of appointing a conservator is "to preserve the estate of an incompetent or disabled person." Tenn. Code Ann. § 34-4-202 (1991 Repl.). (footnote omitted) Pursuant to Tenn. Code Ann. § 34-4-207 (1991 Repl.), a conservator "shall have the same duties and powers as a guardian of a minor, and all laws related to the guardianship of a minor shall be applicable to a conservator." A conservator occupies a fiduciary position of trust of the highest and most sacred character. *See Meloy v. Nashville Trust* Co., 177 Tenn. 340, 149 S.W.2d 73 (1941). The conservator is to manage the conservatee's estate to the best advantage. *See Steele v. Reese*, 14 Tenn. (6 Yer.) 263 (1834). The conservator should endeavor to manage the estate so that if the incompetent person recovers, he or she will find the estate as nearly as possible in the same condition as he or she left it. *See Folts v. Jones*, 175 Tenn. 77, 132 S.W.2d 205, 208 (1939). A conservator should not change the character of the conservatee's property interests unless the change is necessary to protect and promote the interests of the conservatee. *Id.*

> A conservator owes the conservatee an undivided duty of loyalty. 18 Tenn. Juris., Mentally III and Other Incompetents, § 8, p. 323 (1984). The conservator cannot be

allowed by law to have any inducement to neglect the interests of the conservatee. *Freeman v.. Martin*, 181 Tenn. 470, 181 S.W.2d 745, 746 (1944). Therefore, *it is generally held that a conservator violates his or her fiduciary duty by acquiring, by purchase or otherwise, the property of the conservatee*. Id.; see also *Lanius v. Donnell*, 222 Tenn. 58, 432 S.W.2d 659(1968). (emphasis added)

*Grahl*, 971 S.W.2d at 377-378.  Recognizing the foregoing principles, it would be a miscarriage of justice to apply the no exceptions doctrine of *Hume,* for to do so would award a fiduciary for his or her infidelity.  As the seal of the Tennessee Judiciary proclaims, *Fiat Justitia Ruat Caelum*, "Let Justice Prevail Though the Heavens May Fall."[12]  Accordingly, equity mandates the finding that the devise to Plaintiff did not adeem by extinction.

Mrs. Stewart devised unto Plaintiff the real property on Little Hurricane Road his father had owned; yet, most of the devised property is now owned by four of our defendants. Then what does Plaintiff inherit?  Fortunately, we are not left to our own devices to identify or quantify Plaintiff's inheritance.  Authorities from other jurisdictions and the Uniform Probate Code provide excellent guidance.

## Other Jurisdictions

Authorities in other jurisdictions provide a variety of remedies.  Some follow Tennessee's rule of no exceptions to ademption by extinction; however, the majority of jurisdictions now recognize exceptions when the "ademption" is caused by a conservator, guardian or attorney-in-fact. Some jurisdictions qualify their rulings by distinguishing cases based upon the facts.  Several states base the determination on whether the proceeds from the sale are entirely or partly intact or traceable, or fully expended or untraceable.  Other states seek to determine whether the proceeds were expended for the maintenance of the ward.  An excellent source of information which  sets forth the varied approaches to the issue is found in *Ademption or Revocation of Specific Devise or Bequest by Guardian, Committee, Conservator, or Trustee or Mentally or Physically Incompetent Testator*, 84 A.L.R.4th  462.

The foregoing notwithstanding, the trend is to replace the "identity" or *in specie* doctrine, which Tennessee follows, with the less harsh "intent of the testator" doctrine.  The latter favors no ademption or only partial ademption when property is disposed of by a fiduciary of an incapacitated, incompetent or disabled person.  *Estate of Bierstedt*, 119 N.W.2d 234 (1963), reversed an earlier ruling of total ademption, holding that a guardian's sale of a testator's farm while the testator was incompetent to manage his affairs did not effect a total ademption.  Labeling this the "intention" rule, the court explained that it was based "on the principle that to hold otherwise would allow the guardian, either intentionally or unintentionally, to disrupt the dispositive scheme of the testator as evidenced by his last competent act in relation to the specific devise." *Bierstedt* at 238.  A California court reversed a decree of partial ademption reasoning that an "*incompetent testator lacks . . . the*

---

[12]Another interpretation is, "Let justice be done though the heavens should fall."

*opportunity to avoid the effect of ademption by making a new will*," and that "a contrary rule would allow the guardian, by changing the form of guardianship property, to determine the distribution of the estate." *Estate of Mason,* 397 P.2d 1005, 1007 (Cal. 1965) *"To permit such ademption,"* said the court, *"would allow the guardian to destroy his ward's testamentary plan* even though the guardian was acting to protect the ward's economic interests*." Id.* at 1008. (emphasis added)

Although there are a variety of views, the trend clearly disfavors ademption by extinction when the property is sold or "changed" after a testator's incapacity, especially when effected by a fiduciary and the proceeds are traceable. Moreover, some states apply an even stronger exception, holding that ademption does not apply when the testator is incapacitated becomes incompetent and the subject matter of a specific bequest or devise is sold by a guardian or conservator or representative. *See Matter of Estate of Warren*, 344 S.E.2d 795, 798 (N.C.Ct.App.1986); 84 ALR4th 455. The anti-ademption principle has been upheld in other jurisdictions including North Carolina. In *Tighe v. Michal*, 254 S.E.2d 538 (N.C.Ct.App.1979), the principle of ademption was held to not apply when the testator becomes incompetent and the subject matter of a specific bequest or devise is sold by a guardian. The principle arises from the recognition that the sale of property by a guardian or conservator is in no sense to be regarded as a conveyance by the testatrix. *Lewis v. Hill,* 56 N.E.2d 619, 621 (Ill.1944).

Courts and legislatures in several jurisdictions, perceiving harshness in the strict application of the "identity" or *in specie* rule, and realizing that favoritism or greed may be the motive, have adopted special rules to the effect that the representative's conduct does not necessarily or entirely adeem the legacy or bequest. *See*, *Ademption or Revocation of Specific Devise or Bequest by Guardian, Committee, Conservator, or Trustee or Mentally or Physically Incompetent Testator*, 84 A.L.R.4th 462.

### Tennessee Adopts Sec. 2-606 of the Uniform Probate Code

The Uniform Probate Code Sec. 2-606 (UPC) is not only consistent with but is a reason for the national trend. UPC Sec. 2-606 applies the "intention of the testator" rule instead of the "identity" or *in specie* rule employed in *In re Foster Hume.* The official comment to the rule explains why.

> Under the "identity" theory . . . , the common-law doctrine of ademption by extinction is that a specific devise is adeemed – rendered ineffective – if the specifically devised property is not owned by the testator at death. In applying the "identify" theory, courts do not inquire into the testator's intent to determine whether the testator's objective in disposing of the specifically devised property was to revoke the devise. The only thing that matters is that the property is no longer owned at death. The application of the "identify" theory of ademption has resulted in harsh results in a number of cases, where it was reasonably clear that the testator did not intend to revoke the devise. Notable examples include *McGee v. McGee*, 413 A.2d 72 (R.I. 1980); *Estate of Dungan*, 73 A.2d 776 (Del. Ch. 1950).

8 U.L.A. Part I, 2-606 (Supp. 2004), Comment at p. 45. Moreover, the UPC provides guidelines for courts to utilize when the identity of specifically devised property has been changed by a fiduciary. Of greater significance is the fact that UPC Sec. 2-606 was adopted in Tennessee effective June 8, 2004.[13] It is codified at Tenn. Code Ann. § 32-3-111. Thus, Tennessee has joined the majority of jurisdictions that have abandoned the *in specie* doctrine upon which the *Hume* court relied. UPC Sec. 2-606, as adopted in Tennessee reads as follows:

Specifically devised or bequeathed property; incapacitated principals.

(a) A specific legatee or devisee has a right to the specifically gifted or devised property in the testator's estate at death or if the property has been disposed of and a contrary intention is not manifest during the testator's lifetime:

---

[13]Section 2-606. Nonademption of Specific Devises; Unpaid Proceeds of Sale, Condemnation, or Insurance; Sale by Conservator or Agent.

    (a)    A specific devisee has a right to specifically devised property in the testator's estate at the testator's death and to:

        (1)    any balance of the purchase price, together with any security agreement, owed by a purchaser at the testator's death by reason of sale of the property;

        (2)    any amount of a condemnation award for the taking of the property unpaid at death;

        (3)    any proceeds unpaid at death on fire or casualty insurance on or other recovery for injury to the property;

        (4)    any property owned by the testator at death and acquired as a result of foreclosure, or obtained in lieu of foreclosure, of the security interest for a specifically devised obligation;

        (5)    . . . .

        (6)    . . . .

    (b)    If specifically devised property is sold or mortgaged by a conservator or by an agent acting within the authority of a durable power of attorney for an incapacitated principal, or a condemnation award, insurance proceeds, or recovery for injury to the property is paid to a conservator or to an agent acting within the authority of a durable power of attorney for an incapacitated principal, the specific devisee has the right to a general pecuniary devise equal to the net sale price*,* the amount of the unpaid loan, the condemnation award, the insurance proceeds, or the recovery.

    (c)    The right of a specific devisee under subsection (b) is reduced by any right the devisee has under subsection (a).

    (d)    For the purposes of the references in subsection (b) to a conservator, subsection (b) does not apply if, after the sale, mortgage, condemnation, casualty, or recovery, it was adjudicated that the testator's incapacity ceased and the testator survived the adjudication by one year.

    (e)    For the purposes of the references in subsection (b) to an agent acting within the authority of a durable power of attorney for an incapacitated principal, (i) "incapacitated principal" means a principal who is an incapacitated person, (ii) no adjudication of incapacity before death is necessary, and (iii) the acts of an agent within the authority of a durable power of attorney are presumed to be for an incapacitated principal.

Uniform Probate Code, Sec. 2-606 (amended 1997), 8 U.L.A. Part I, 2-606 (Supp. 2004) (sections (a)(5) and (6) were not adopted by Tennessee)

(1) Any balance of the purchase price, together with any security interest, owing from a purchaser to the testator at death by reason of sale of the property;

(2) Any amount of a condemnation award for the taking of the property unpaid at death;

(3) Any proceeds unpaid at death on fire or casualty insurance on, or other recovery for injury to, the property; and

(4) Property owned by the testator at death and acquired as a result of foreclosure, or obtained in lieu of foreclosure, of the security interest for a specifically devised obligation.

(b) *If specifically devised or bequeathed property is sold* or mortgaged by a conservator or *by an agent acting within the authority of a durable power of attorney* for an incapacitated principal, or if a condemnation award, insurance proceeds, or recovery for injury to the property are paid to a conservator or to an agent acting with the authority of a durable power of attorney for an incapacitated principal, *the specific devisee has the right to a general pecuniary devise equal to the net sale price*, the amount of the unpaid loan, the condemnation award, the insurance proceeds, or the recovery.

(c) The right of a specific legatee or devisee under subsection (b) is reduced by any right the legatee or devisee has under subsection (a).

(d) For purposes of the references in subsection (b) to a conservator, subsection (b) does not apply if after the sale, mortgage, condemnation, casualty, or recovery, it was adjudicated that the testator's incapacity ceased and the testator survived the adjudication by one (1) year.

(e) For the purposes of the references in subsection (b) to an agent acting within the authority of a durable power of attorney for an incapacitated principal:

(1) "Incapacitated principal" means a principal who is an incapacitated person;

(2) *No adjudication of the principal's incapacity need occur* before death; and

(3) *The acts of an agent within the authority of a durable power of attorney are presumed to be for an incapacitated principal*, such presumption rebuttable by clear and convincing evidence of capacity.

Tenn. Code Ann. § 32-3-111. (emphasis added)

As Tenn. Code Ann. § 32-3-111(b) now provides, a specific devisee, such as Plaintiff, has the right to a general pecuniary devise equal to the net sale price when the specifically devised

property is sold by an attorney-in-fact. The fact that Mrs. Stewart was never declared incapacitated is irrelevant because, as the statute provides, there need not be an adjudication of incapacity. Tenn. Code Ann. § 32-3-311(e)(1) and (2). Moreover, the statute "presumes" the agent is acting for an incapacitated person. Tenn. Code Ann. § 32-3-311(e)(3).

As the foregoing discussion of remedies explains, since the specifically devised property was sold by Mrs. Stewart's attorneys-in-fact, who acted in contravention of the power of attorney granted to them and in violation of Tenn. Code Ann. 34-6-108(c)(6), Plaintiff has the right to enforce the constructive trust and to recover the assets held in trust, specifically the net proceeds of the sale of the realty, along with interest thereon. He also has the alternative right, as the specific devisee, to recover the general pecuniary devise equal to the net sale price pursuant to Tenn. Code Ann. § 32-3-111(b).[14]

### The Four Non-Fiduciary Defendants

The Fiduciaries are but two of the six defendants. Diane Paul, the daughter of Demple Sewell, her husband Tom Paul, and their friends, Robert and Rhonda Blocker are also defendants. They are the purchasers of the devised property. Plaintiff contends the deed is voidable and should be rescinded because these defendants acted in collusion with the Fiduciaries, with the knowledge that the Fiduciaries were committing a breach of their fiduciary duties to Mrs Stewart.

There are circumstances where a third party may be liable due to the agent's breach of a fiduciary duty. Section 314 of the Restatement (Second) of Agency explains:

> A person who receives the principal's property from an agent of another, with notice that the agent is thereby committing a breach of fiduciary duty to the principal, holds the property thus acquired as a constructive trustee, or at the election of the principal, is subject to liability for its value; one who receives such property, non-tortiously and without notice, but who is not a bona fide purchaser, is subject to liability to the extent to which he has been unjustly enriched.

Restatement (Second) of Agency § 314 (2004). Further, if a third person intentionally causes or assists an agent to violate their fiduciary duty to the principal, the third person is subject to liability in tort for any harm they have caused the principal or in an action for restitution for profit they derived from the transaction. 3 Am.Jur.2d Agency § 299 (1986). Further, a contract executed between the principal's agent and a third party is voidable if collusion existed between the agent and the third party. *Hawkins v. Byrn*, 261 S.W. 980, 982 (1924); 1 Tenn. Jur. Agency § 55 (2001).

Mrs. Stewart's power of attorney authorized the Fiduciaries to sell her real property and to execute deeds and other instruments necessary to convey the property. Thus, the Fiduciaries had the authority to sell the devised property and to execute the deeds to memorialize the sale. While the

---

[14]The plaintiff may pursue one or both of these remedies but he may only recovery on one of them.

fact the Fiduciaries' sold the real property for almost 30% below the appraised value is questionable, this fact, standing alone, is insufficient to sustain a finding of collusion on the part of the four non-fiduciary defendants or that they intentionally caused the Fiduciaries to violate their fiduciary duties to Mrs. Stewart. The record, however, provides at least three other suspicious circumstances in addition to the discounted purchase price. One is the Fiduciaries' decision to sell the realty without offering it for sale to the public, with or without the assistance of a licensed real estate agent or auctioneer is more suspicious. Another is the fact that the Fiduciaries sold the property to one of their children, her spouse and two friends, which exacerbates the situation and renders the transaction even more suspicious. Third, is the fact that the Fiduciaries sold the property at a time when there was no present need, at least no pressing need to liquidate Mrs. Stewart's assets because Mrs. Stewart had ample cash assets to pay for her present needs, including the nursing home expenses. The only conceivable reasons to hurry up and sell the property were either to avoid disclosing the asset to the nursing home, to deprive the Plaintiff of the inheritance by causing an ademption of the specific devise to the Plaintiff, to sell the property to one of the Fiduciaries' children at a bargain basement price, or to change the character of the asset in order to re-title the proceeds in the name of the Fiduciaries. However, these factors, without more, only serve as evidence against the Fiduciaries for allegedly breaching their fiduciary duties to Mrs. Stewart by selling the property for almost 30% below the appraised value.

Therefore, the evidence does not preponderate against the trial court's conclusion that the evidence was insufficient to prove that the four non-fiduciary defendants were in collusion with or intentionally caused the Fiduciaries to violate their fiduciary duties or that they had notice the Fiduciaries were committing a breach of their fiduciary duties. Accordingly, we affirm the trial court's dismissal of the claims against the four non-fiduciary defendants Diane Paul, Tom Paul, Robert Blocker and Rhonda Blocker.

## In Conclusion

We affirm the trial court's dismissal of Plaintiff's cause of action against the non-fiduciary defendants Diane Paul, Tom Paul, Robert Blocker and Rhonda Blocker; however, we reverse that portion of the final judgment that dismisses Plaintiff's causes of action against the Fiduciaries, Demple Sewell and Bobby Judkins, and award Plaintiff, George Haskell Stewart, a judgment against the Fiduciaries, Demple L. Sewell and Bobby L. Judkins, in the amount of the net proceeds resulting from the sale of the devised property plus pre-judgment interest computed from the date of sale of the devised property. This matter is remanded to the trial court for the entry of a judgment consistent with this opinion. Costs of appeal are assessed against Demple L. Sewell and Bobby L. Judkins.

_____
FRANK G. CLEMENT, JR., JUDGE

-23-