# HEARD et al. v. MILES.—222 S. W. (2d) 848.

Western Section. January 21, 1949.

Petition for Certiorari denied by Supreme Court, June 18, 1949.

McDonald, McDonald & Kuhn, George S. Miles, and John O. Osoinach, all of Memphis, for appellant.

Evans, Exby & Moriarty, and Bertrand W. Cohn, all of Memphis, for appellee.

MOSS, Sp. J. Mrs. Amy Brown Miles instituted this suit in the Chancery Court of Shelby County by filing a bill of interpleader against defendants, Marx & Bensdorf, Inc., Joyner-Heard Realty Company, and others, alleging that she had sold a certain parcel of real estate in Memphis for $135,000, and that both Marx & Bensdorf, Inc., and Joyner-Heard Realty Company were claiming a broker's commission of $4,550 on the sale. She offered to pay one such commission, and to pay the fund into the registry of the Court for the benefit of the broker entitled to it. After several pleadings were filed, the complainant was permitted to file an amended and sup-

plemental bill in which she averred the defendant, Joyner-Heard Realty Company, was entitled to the broker's commission for effecting the sale; she denied owing any commission to Marx & Bensdorf, Inc., and prayed a declaratory judgment as to whether or not she must also pay the commission to that Company. The amount of the fund involved was agreed to and was paid into the registry of the Court. Marx & Bensdorf, Inc., filed an answer and crossbill, making its claim for the commission because of facts and circumstances hereinafter detailed. The Chancellor decreed in favor of Mrs. Miles, and Marx & Bensdorf, Inc., has appealed and assigned error.

The material facts are not in dispute. Mrs. Miles was the owner of an improved parcel of real estate located on South Second Street in Memphis, which she had acquired by purchase at a foreclosure sale in March, 1937. Her father, R. L. Brown, had owned the property, a second mortgage was foreclosed, and she bought in the property at this foreclosure sale, taking title subject to the first mortgage securing an indebtedness of $115,000 evidenced by 115 bonds in the denomination of $1,000 each. These bonds had been sold by the defendant, Marx & Bensdorf, Inc., to its customers. Mr. Brown had defaulted in the payment of the first mortgage bonds in 1935, and Marx & Bensdorf, Inc., had arranged an extension of time at a meeting of bondholders, and a forbearance agreement had been executed in May, 1935, by Mr. Brown, the bondholders and Marx & Bensdorf, Inc., pursuant to which the management of the property was turned over to Marx & Bensdorf, Inc., and the property was leased to Jolly's Motor Livery Corporation for a five-year term, beginning January 1, 1936. Mrs. Miles took title to the property subject to this forbearance agreement, `the

lease contract, and the first mortgage securing the bonded indebtedness of $115,000.

In 1940, a new forbearance agreement was executed between Mrs. Miles, the bondholders and Marx & Bensdorf, and a new lease made with Jolly's Motor Livery Corporation. This forbearance agreement ran until January 1, 1945, and the lease until January 1, 1946. Marx & Bensdorf, Inc., negotiated or arranged for the forbearance agreements mentioned, also the leases with Jolly's Motor Livery Corporation, and the lease contracts were on printed forms prepared and used regularly by Marx & Bensdorf. Marx & Bensdorf continued to manage the property, collect rents, pay taxes, insurance premiums, etc., and make all disbursements. For that, they received the customary commission.

The second forbearance agreement expired January 1, 1945. At that time, Mrs. Miles was on duty with the U. S. Navy, the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U. S. C. A. Appendix, Section 501 et seq. was in force, and no foreclosure of the first mortgage was attempted. Mrs. Miles left the service in December, 1945, but in the meantime, a third forbearance agreement had been executed, extending the time for foreclosure of the first mortgage to January 1, 1948, and a new lease with Jolly's Motor Livery Corporation had been executed, to run until December 31, 1948. The lease was dated March 12, 1945, and the third forbearance agreement was executed on July 30, 1945. Mrs. Miles was out of the city during the period of negotiation and execution of these documents, and a Memphis lawyer, who was an old friend of her family, assisted in the negotiations for her, and sent her the lease contract for her signature. He was not employed as her attorney, was not compensated

for the service, and the record discloses that he was merely acting for Mrs. Miles as a friend and in a business capacity during her absence from the city when she was not in position to give personal attention to her business affairs. The last forbearance agreement provided that if the property was not sold by January 1, 1948, and if the first mortgage bonds were still unpaid, Mrs. Miles would deed the property to the holders of the bonds secured by the first mortgage, or their nominee.

The three lease contracts between Mrs. Miles and Jolly's Motor Livery Corporation were introduced in evidence, and these exhibits are in the transcript of the record in this Court in their original form. They appear to be very similar, if not identical, except as hereinafter mentioned. The forms are printed, with thirty-five numbered paragraphs or sections, and with names, dates, description of the property, and specific terms typewritten in spaces left for that purpose. Paragraph numbered 30 of the third lease, which is responsible for this suit, is as follows: "This lease was negotiated by Marx & Bensdorf, Inc., acting as Agent for the Lessor, and Lessor agrees to pay Marx & Bensdorf, Inc., the usual commission (in accordance with the rules of the Real Estate Board of Memphis) for services in negotiating this lease; also to pay Marx & Bensdorf, Inc., the usual commission for any subsequent lease that may be entered into by Lessor with the Lessee, covering the within leased premises; also a commission on any subsequent agreement to sell or exchange made with or through Lessee."

This section or pargraph is exactly like paragraph numbered 30 in the first two leases, except that in the first two the paragraph ended with the word "premises".

In the third lease, the period following the word "premises" is changed to a semicolon, and the following words: "also a commission on any subsequent agreement to sell or exchange made with or through Lessee" were printed, in the same type as the remainder of the lease form, in the space of one line, between the paragraph in question and paragraph 31 following. Marx & Bensdorf had changed their lease form so as to include the words quoted above shortly before the execution of this particular lease, and had had these words overprinted on all their lease forms then in stock.

There is no dispute about the fact that no one ever called Mrs. Miles' attention to this provision in the lease in reference to a commission on a sale of the property to the lessee, before she signed the contract dated March 12, 1945. Mrs. Miles testified that she was in Washington, serving in the Navy, when the lease was sent to her for execution; that she did not notice any difference in the general appearance of it from the one she had previously executed, and that she read no part of the lease contract except the typed portions. She did not read the fine print, did not notice or read the provision in reference to paying a commission on a sale to the lessee, and did not know such a provision was in the contract until several years later, when Marx & Bensdorf made claim for commission after she had arranged with Joyner-Heard Company to sell the property. Mr. Eaton M. Elder, Vice President of Marx & Bensdorf, who was in charge of the leasing department, testified as to the long experience of Marx & Bensdorf with this property, arranging for the leases, forbearance agreements, etc., and said that the lease in question was prepared by Marx & Bensdorf and sent to the family lawyer to be forwarded to her for her signature, and that it was in due

course returned to Marx & Bensdorf with Mrs. Miles' signature thereto. He had not communicated with Mrs. Miles in the matter, and had not called any one's attention to the new matter inserted in the lease.

Mr. Charles J. Haase, President of Marx & Bensdorf, also testified in detail regarding the history of the forbearance agreements and the leases. He said that Mrs. Miles' attorney prepared the last forbearance agreement, and that Marx & Bensdorf prepared the lease and submitted it to the attorney for execution by Mrs. Miles. Neither he nor any one else testified that Marx & Bensdorf, or any of its officers, employees or agents, notified Mrs. Miles or her attorney of' the insertion in the third lease form of the printed words in reference to paying a commission if the property should be sold to the lessee.

The lease involved, like the lease of June 13, 1940, between the same parties, is signed by Amy Brown Miles, as lessor, and Jolly's Motor Livery Corporation, as lessee. It is not signed by Marx & Bensdorf, Inc.

There is much testimony in the record as to the extent and value of services performed by Marx & Bensdorf in the matter of arranging the forbearance agreements and leases, and managing the property for the owners for a number of years, and on the question of the adequacy or inadequacy of the compensation or commission charged by Marx & Bensdorf for that service. The evidence is in dispute as to whether or not Marx & Bensdorf made any effort to sell the property to Jolly's Motor Livery Corporation, or any one else, knowing that it had to be sold for enough to enable Mrs. Miles to pay off the first mortgage of $115,000 prior to January 1, 1948, else she would lose the property. Mrs. Miles testified that after she returned from naval service, she real-

ized that she would have to sell it for more than the amount of the mortgage within the next two years; and not knowing that she was under obligation to Marx & Bensdorf to pay that firm a sales commission, she employed several agencies at different times, and finally Joyner-Heard Company, to sell the property. That firm of real estate brokers or agents did arrange for a sale of the property to Jolly's Motor Livery Corporation in September, 1947, for $135,000, or $20,000 more than the first mortgage. The contract of sale was executed by Dave Jolly and Mrs. Miles, also by Joyner-Heard Realty Company, Agents. Dave Jolly was the President of Jolly's Motor Livery Corporation, and, on his order, the deed executed by Mrs. Miles was to Jolly's Motor Livery Corporation. She did not know that Marx & Bensdorf claimed a commission on the sale of the property until after the contract had been signed, when the news of the claim came to her son.

The decree of the Chancery Court of Shelby County was in favor of the complainant, upon the grounds that the pertinent provision of paragraph 30 of the lease contracts which is here in question is ambiguous and unenforceable; that since it was prepared by Marx & Bensdorf, Mrs. Miles' agent, on one of the company's printed forms, it should be construed more strongly against Marx & Bensdorf, and also because the agreement to sell the property to the lessee was with Dave Jolly individually, whereas the lessee was in fact the Jolly Motor Livery Corporation, and, therefore, there was no agreement to sell to the lessee within the meaning of the sentence in question.

Marx & Bensdorf contend here that the Chancellor erred because paragraph No. 30 of the lease contract is plain and unambiguous, needing no interpretation, and

that at least any uncertainty on its face could be removed by the introduction of extrinsic evidence explaining the intentions of the parties; and in holding that the agreement to sell was made with Dave Jolly individually, and not with the Jolly Motor Livery Corporation, since the deed to the property which Mrs. Miles executed was in fact to Jolly's Motor Livery Corporation. And it is earnestly insisted in appellant's brief, and was ably argued at the bar of the Court, that it was not necessary for Marx & Bensdorf to be the procuring cause of the sale to Jolly's Motor Livery Corporation as is usually the case when a real estate broker earns or claims a commission, but that the consideration for the commission claimed because of the sale to the tenant, in addition to the commission already received for leasing and managing the property for Mrs. Miles, was furnished by the services of the broker in negotiating the lease, arranging for the forbearance agreements, and otherwise looking after this property for Mrs. Miles during a period of years before it was sold to the lessee. The case of Burt v. Brownstone Realty Co., 95 N. J. L. 457, 460, 112 A. 883, is relied on by appellant as its principal authority for this contention.

On the other hand, appellee, Mrs. Miles, insists that the Chancellor's decree was correct, not only for the reasons set out in the decree, but because the defendant and cross-complainant, Marx & Bensdorf, cannot maintain a suit (here by cross bill) as a third party beneficiary under provisions of the kind involved in this lease, also because a real estate agent or broker must be the procuring cause of the sale to become entitled to a commission, and finally, because Mrs. Miles' agent, Marx & Bensdorf, breached its duty as an agent, or failed to perform the duties imposed upon a fiduciary

in such matters, by not calling Mrs. Miles' attention to the provision inserted or overprinted at the end of paragraph 30 of the lease, and thus disclosing to its principal the agent's interest in any sale which might be made to the lessee.

We think that the contention last mentioned is sound, and that the provision of the contract obligating Mrs. Miles to pay Marx & Bensdorf a commission if the property should be sold to the lessee is voidable at Mrs. Miles' option. To hold otherwise would do violence to fundamental and well-settled principles of the law governing the relationship of principal and agent. This relationship is one of trust and confidence, and a real estate agent is a fiduciary. In any matter connected with the agency, the agent can in no way and under no circumstances act for himself or for any other than the principal without first making full and complete disclosure of the facts to the principal. He cannot profit by his failure to make such disclosure.

The clearest and best expression of the rule referred to is found in Pomeroy's Equity Jurisprudence, Vol. II, Sec. 959, as follows: ''Principal and Agent.—Equity regards and treats this relation in the same general manner, and with nearly the same strictness, as that of trustee and beneficiary. The underlying thought is, that an agent should not unite his personal and his representative characters in the same transaction; and equity will not permit him to be exposed to the temptation, or brought into a situation where his own personal interests conflict with the interests of his principal, and with the duties which he owes to his principal. In dealings without the intervention of his principal, if an agent for the purpose of selling property of the principal purchases it himself, or an agent for the purpose of buying

property for the principal buys it from himself, either
directly or through the instrumentality of a third per-
son, the sale or purchase is voidable; it will always be
set aside at the option of the principal; the amount of
consideration, the absence of undue advantage, and other
similar features are wholly immaterial; nothing will
defeat the *principal's right of remedy except his own
confirmation after full knowledge of all the facts.* Pass-
ing to dealings connected with the principal's inter-
vention, in any contract of purchase or sale with the
principal, or other transaction by which the agent ob-
tains a benefit, *a presumption arises against its validity
which the agent must overcome;* although this presump-
tion is undoubtedly not so weighty and strong as in
the case of a trustee. The mere fact that a reasonable
consideration is paid, and that no undue advantage is
taken, is not of itself sufficient. Any unfairness, any un-
derhanded dealing, any use of knowledge not communi-
cated to the principal, any lack of the perfect good faith
which equity requires, renders the transaction voidable,
so that it will be set aside at the option of the principal.
If, on the other hand, the agent imparted all his own
knowledge concerning the matter, and advised his prin-
cipal with candor and disinterestedness, as though he
himself were a stranger to the bargain, and paid a fair
price, and the principal on his side acted with full knowl-
edge of the subject-matter of the transaction and of the
person with whom he was dealing, and gave a full and
free consent,—if all these are affirmatively proved, the
presumption is overcome, and the transaction is valid.
*These general doctrines are applied under every variety
of circumstances, and to every kind of transaction.* As
illustrations, when the agent has, during his employment,
discovered a defect in his principal's title, he cannot,

after the agency is ended, use such knowledge for his own benefit; much less can he do so while the agency exists. Nor is an agent employed to purchase or to sell, or in any other business, permitted to make profit for himself in the transaction, unless by the plain consent of his employer; for all such profits wrongfully made he must account to his principal; and if he has taken the legal title to property in violation of his fiduciary duty, equity will treat him as a trustee thereof for his principal. A gift by a principal to his agent may be valid and be sustained, if the absolute good faith, knowledge, and intent of both the parties is clearly established. After the agency has been ended, and the fiduciary relation has ceased, the foregoing rules no longer operate; the parties may deal with each other in the same manner as any other persons." (Italics ours).

Section 253, "Agency", 2 Am. Jurisprudence, page 204, is also applicable: "Duty Not to Act as Adverse Party.—The doctrine is familiar and well recognized that an agent cannot, either directly or indirectly, have an interest in the subject-matter of the agency without the consent of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal. The object of the rule is to secure fidelity on the part of the agent to the principal and to insure the transaction of the business of the principal for his best advantage. This doctrine is based on the idea of closing the door to temptation to fraud and keeping the agent's eye single to the rights and welfare of his principal, rather than on the idea that the transaction is necessarily an injury to, or a fraud upon, the principal. Hence, a principal need not prove any injury to avoid a transaction in which the agent has acted as an adverse party without his knowledge and consent.

The principle is one of prevention, not remedial justice, which operates however fair the transaction may have been—however free from every taint of moral wrong.''·

Abundant authority sustains these general principles although we have not found and briefs of the parties have not referred to any case involving facts identical with those here involved. Perhaps as clear and succinct a statement of the basic general law on the subject as can be found anywhere was written by Chancellor Cooper in Tynes v. Grimstead, 1 Tenn. Ch. 508, at page 510, as follows: ''No principle is better settled, or founded upon a sounder basis of positive law or legal ethics, than that which declares that whoever undertakes to act for another, in any matter, shall not, in the same matter act for himself, and this without respect to the fact whether the party has or has not made a profit by the act. Equity disallows the measure upon general principles, without reference to advantages or unfairness.''

The principle is applied under varying cicumstances in Webb v. Cooper, 8 Tenn. Civ. App., 438; Raht v. Union Consol. Mining Co., 73 Tenn. 1 and McNeill v. Dobson-Bainbridge Realty Co., 184 Tenn. 99, 195 S. W. (2d) 626, and in other Tennessee cases. See also 3 C. J. S., Agency, Section 145, page 25.

The lease contract involved is an agreement between Mrs. Miles and Jolly's Motor Livery Corporation. It was signed only by them. It was prepared by Marx & Bensdorf as the agent of Mrs. Miles and was forwarded to her for her signature in the course of the routine of renewing a similar lease or contract between the same parties which had also been prepared by the same agent. If A's obligations under a contract with B are not plain to A at the time he executes the instrument, A will not be heard to say that he did not read the contract before

he signed it and that he did not understand or know the extent of his obligations to B as therein set out, the contract having been prepared by C, the agent of A. For the principal is chargeable with and bound by the knowledge of his agent in reference to any matter over which the agent's authority extends—so far as the principal's duties or obligations to a third party are concerned. But such is not the rule as to a provision in the contract which was inserted by the agent for the benefit of the agent, and which was not called to the principal's attention by the agent or any one else, and which the principal did not know was contained therein. It would have been an easy matter for Marx & Bensdorf to advise Mrs. Miles or her Memphis attorney by letter, post card or telephone that the new lease contained an additional sentence at the end of paragraph 30. This the agent, Marx & Bensdorf, does not claim to have done. If it had been done and if Mrs. Miles had approved and signed the contract with knowledge of the obligation to Marx & Bensdorf, she would most likely have urged that firm to make a more diligent and energetic effort to sell her property, and no doubt would have discussed the matter with Marx & Bensdorf before obligating herself to pay a commission to another broker.

It is proper and fair to state that the record discloses no fraud, intentional bad faith or unfairness on the part of Marx & Bensdorf or any of its officers or agents. No such conduct has been charged or intimated by Mrs. Miles or her solicitors in this cause, nor has it been suggested that Marx & Bensdorf intended to take undue advantage of its principal, Mrs. Miles, in any manner or to any extent. However "The principle is one of prevention, not remedial justice, which operates however

fair the transaction may have been—however free from every taint of moral wrong.''

We think it was the plain duty of the agent, Marx & Bensdorf, to disclose to its principal, Mrs. Miles, the fact that a provision had been inserted in the renewal lease for the benefit of Marx & Bensdorf. This was not done and she signed the lease without knowledge of the provision that she would owe Marx & Bensdorf a commission if the property involved should be sold to the lessee. Therefore this feature of the agreement is voidable at her option, and for this reason we sustain the decree of the Chancellor.

Having reached the conclusion that the contract sued upon is unenforceable for the reasons stated, we deem it unnecessary to discuss the merits of other questions involved, such as the matter of consideration or lack of it, whether or not the contractual provision in question is unenforceable because of uncertainty or ambiguity, and other defenses to the claim of Marx & Bensdorf. We affirm the Chancellor's decree, and the costs are decreed against the appellant Marx & Bensdorf.

Anderson, P. J., and Baptist, J., concur.