IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 13, 2024 Session

## ESTATE OF JOHN A. QUEENER v. JIM GRIFFITH

**Appeal from the Chancery Court for Knox County**
**No. 185381-1     John F. Weaver, Chancellor**

———————————————————

**No. E2023-00722-COA-R3-CV**

———————————————————

The Estate of John A. Queener (the "Estate"), by and through Personal Representative, Carolyn Q. Junck, seeks to recover funds paid out with respect to two certificates of deposit ("CDs") owned by the decedent, John A. Queener (the "Decedent"), at the time of his death and funds paid from the Decedent's checking account during his lifetime. The Estate sued Jim Griffith ("Mr. Griffith"), stepson of the Decedent, and relied upon legal theories of undue influence, fraud and/or fraud in the inducement, lack of competency in the contract, and conversion. Following a bench trial, the trial court awarded the Estate $13,355.05 plus pre- and post-judgment interest against Mr. Griffith to reimburse the Estate for a number of checks that Mr. Griffith wrote from the Decedent's checking account during the Decedent's lifetime. The trial court denied the Estate any recovery with respect to the CDs. On appeal, the Estate and Mr. Griffith both raise issues with the trial court's judgment. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

W. Tyler Chastain, Knoxville, Tennessee, for the appellant, Carolyn Q. Junck.

John T. Johnson, Jr. and Erica D. Green, Knoxville, Tennessee, for the appellee, Jim Griffith.

# OPINION

## BACKGROUND

The Decedent and Delores Griffith ("Mrs. Queener") married in November 1995. The Queeners lived in Helenwood, Tennessee and were close with Mrs. Queener's son, Mr. Griffith; Mr. Griffith's wife, Rebecca Griffith ("Mrs. Griffith"); and the Griffiths' children. The Decedent had three adult children from a prior marriage; however, there is no dispute that the Queeners spent far more time with the Griffiths than with any of the Decedent's children. The Decedent moved into Heritage Assisted Living ("Heritage") in Knoxville, Tennessee in late October 2008 and resided there until March 2011. The trial court found that the Griffiths were the Decedent's primary caretakers outside the assistance provided by Heritage. In March 2011, the Decedent was admitted to a local hospital to be treated for pneumonia. The Decedent was discharged from the hospital to Brakebill Nursing Home ("Brakebill"), also in Knoxville, at the end of March 2011. The Decedent did not leave Brakebill for any reason until his death at the age of 91 years old on June 13, 2011. Mrs. Queener survived the Decedent.

Letters of Administration were issued to the Decedent's daughter, Carolyn Q. Junck ("Ms. Junck") on September 28, 2011, which granted her the authority to administer the Estate. On May 31, 2013, Ms. Junck, in her capacity as Personal Representative of the Estate, filed a Verified Petition to Set Aside Fraudulent Transfers and for Damages against Mr. Griffith. With leave of the trial court, the Estate filed a First Amended Complaint on December 5, 2014. The Amended Complaint avers that Mr. Griffith was an authorized user of the Decedent's checking account at Knoxville TVA Employees Credit Union (the "credit union"). It further avers that Mr. Griffith made disbursements from the Decedent's checking account to himself, Mrs. Griffith, and/or a business owned by Mr. Griffith and that certain of these disbursements were not authorized by, or made for the benefit of, the Decedent. It also avers that Mr. Griffith caused the proceeds of two CDs owned by the Decedent at the time of his death to be paid to Mrs. Queener and Mrs. Griffith in contravention of the Decedent's express intentions. Finally, it avers that these actions were accomplished through "misrepresentation, undue influence, and lack of competency of the Decedent, and [that] the fraudulent transfers were all made for the purpose of depriving the Estate of any funds for distribution under the laws of intestacy and to unjustly enrich" Mr. Griffith.

In 2008, after the Queeners' move to Knoxville from Helenwood, the Decedent transferred $300,000 from First National Bank to the credit union. These funds were used to purchase three CDs. Once a purchased CD reached its maturity date, it would be continued or the proceeds of the matured CD would be deposited into a separate account at the credit union. The Decedent would routinely use the proceeds of a matured CD to purchase a new CD with the same term, face value, and beneficiary designation as the one

that had just matured. At the time of his death, the Decedent owned three CDs: CD 89,[1] the payable-on-death beneficiary of which was Mrs. Griffith, with a face value of $25,000; CD 90, the payable-on-death beneficiaries of which were the Decedent's three adult children, with a face value of $250,000; and CD 91, the payable-on-death beneficiary of which was Mrs. Queener, with a face value of $25,000. The original three CDs purchased from the credit union by the Decedent in December 2008 had the same face values and beneficiary designations as the three CDs that were in existence at the time of his death.

Also relevant to this appeal is an authorized user signature form ("AUSF") signed by the Decedent, which allowed Mr. Griffith to write checks from the Decedent's checking account. The Estate argued that Mr. Griffith was able to obtain this check writing authority and to get Mrs. Queener and Mrs. Griffith named as the beneficiaries on CDs by taking advantage of the Decedent's weakened mental state. However, the trial court found that argument to be inconsistent with the testimony of the Decedent's personal physician, the conduct of Ms. Junck, and the testimony of a credit union employee.

At issue are a Limited Agreement designating Mrs. Griffith as the payable-on-death beneficiary for CD 89 and a separate Limited Agreement designating Delores Griffith[2] as the payable-on-death beneficiary for CD 91. In the absence of these Limited Agreements, upon the Decedent's death, the proceeds of the CDs would have been payable to the Estate. The Decedent's signature on each of the Limited Agreements is not dated; however, the Limited Agreements are dated by credit union staff as having been received by the credit union and entered in its system on April 28, 2011. Despite this, it is undisputed that the Decedent did not travel to the credit union, or even leave Brakebill, at any time in April 2011.

Karen Taylor ("Ms. Taylor"), a Senior Member Service Representative at the credit union with annual training in elder abuse and undue influence, primarily handled the Decedent's accounts. Ms. Taylor testified in person at trial. Her credibility is a point of much contention between the parties and gives rise to one of Appellant's issues on appeal. Regarding Ms. Taylor's testimony, the trial court found:

> . . . [Ms. Taylor] testified that the credit union would not accept any document requiring the [D]ecedent's signature unless an employee of the credit union saw the [D]ecedent sign the document or the [D]ecedent signed the document before a notary public. She further testified that all of the documents bearing the [D]ecedent's signature were signed on the credit union's premises. In that regard, the [Estate] pointed out that the [AUSF] was dated August 7,

---

[1] The full account numbers for the CDs are the Decedent's checking account number followed by a two-digit suffix. As the parties and the trial court did below, we identify each CD by its account suffix.

[2] It is undisputed that Delores Griffith is a misnomer for Mrs. Queener.

2009 but that the [D]ecedent was with [Ms. Junck] and other members of the [D]ecedent's family at a resort in Gatlinburg, Tennessee on that date. The [Estate] also pointed out that the limited agreements . . . are dated April 28, 2011 but that the [D]ecedent never left the premises of [Brakebill] after his admission to the nursing home on March 29, 2011. . . . [Ms. Taylor] testified that the dates of August 7, 2009 and March 29 [*sic*], 2011 did not necessarily represent the dates that the [D]ecedent signed the documents. Irrespective of everything else, she testified that the dates represented only the dates on which the credit union entered the documents into its record system and not the actual dates of the transactions. . . .

* * *

In connection with the [CDs], [Ms. Taylor] provided investment advice to the [D]ecedent. The beneficiary designations were made by the [D]ecedent. When [Ms. Taylor] first started meeting with the [D]ecedent, he stated that he wanted one [CD] to go to [Mrs. Queener] and one [CD] to go to [Mrs. Griffith]. According to [Ms. Taylor], she was satisfied that all of the [D]ecedent's transactions concerning his [CDs] and the [AUSF] for the [D]ecedent's checking account were all completed as the result of the [D]ecedent's own will.

* * *

[Ms. Junck] testified that the signatories on the limited agreements for the [CDs], including the large [CD] of $250,000.00 for herself and her two siblings, as well as the [AUSF] for check writing, are not the signatures of the [D]ecedent. The [trial] court, however, finds that the testimony of [Ms. Taylor] is more persuasive and that the circumstances, as well as [Ms. Taylor]'s mandatory business routines or habits, substantiate that the signatures are those of the [D]ecedent. The [trial] court also finds, in accordance with [Ms. Taylor]'s testimony, that the [Estate]'s reliance upon the purported dates of documents to show the [D]ecedent's unavailability for signing the documents, is misplaced. [Ms. Taylor] explained that those dates are the dates when the documents were entered into the credit union's record system and not necessarily the dates when the [D]ecedent actually signed them.

* * *

. . . The only evidence of forgery is the [Estate]'s denial of the [D]ecedent's signatures and [Ms. Junck's] circumstantial evidence that the [D]ecedent was

not available to sign the documents as dated. [Ms. Junck's] testimony is directly refuted by the testimony of [Ms. Taylor] that she saw the [D]ecedent sign each limited agreement as well as the [AUSF] for the checking account. Also, as discussed above, the dates on the limited agreements are unreliable.

. . . A suspicious circumstance, however, exists respecting the limited agreements. [Mr. Griffith] testified that he had several pre- [*sic*] limited agreements within his possession or access. [Ms. Taylor] testified that she never gave any blank limited agreement forms to [Mr. Griffith]. However, that testimony does not mean that [Mr. Griffith] could not have gotten the forms from someone else at the credit union or from another branch. Conversely, [Ms. Taylor] testified that her initials (or signature) at the bottom of each limited agreement, in question, meant that she personally witnessed the [D]ecedent's signing of the document. There was no proof that any such pre-signed form was actually used by [Mr. Griffith], other than circumstantially from the theory that the [D]ecedent was unavailable at the time that the limited agreements were executed in 2009 and 2011 as well as from the forms in 2011 showing the [D]ecedent's prior address. However, [Ms. Taylor]'s testimony that the dates of the limited agreements are not reliable removed them as evidentiary pivot points. She also testified, point-blank, that she personally saw the [D]ecedent sign each limited agreement and the [AUSF]. Additionally, the credit union's statements of account also show that the purported dates of the limited agreements may not coincide with the actual dates of the transactions.

The trial court noted that the Estate put forth inconsistent theories to support its claim with respect to the CDs. The trial court noted that at trial, the Estate relied primarily upon the theory of forgery;[3] however, the Amended Complaint averred that Mr. Griffith obtained the Decedent's execution of the Limited Agreements by undue influence. Given that Ms. Junck's testimony regarding the purported forgeries was "directly refuted" by Ms. Taylor's testimony that she saw the Decedent sign each Limited Agreement, and given the unreliable dates on the Limited Agreements, the trial court found that the Estate's reliance upon the theory of forgery was not sufficiently proven.

As to the undue influence theory, the trial court found that the Estate's theory that Mr. Griffith had "tak[en] advantage of the [D]ecedent's weakened mental state" was "inconsistent with the testimony of the [D]ecedent's personal physician, the conduct of [Ms. Junck], and further testimony of [Ms. Taylor]." Moreover, considering the

---

[3] When asked at trial why she believed that the Estate was entitled to recover the funds paid out with respect to the CDs, Ms. Junck answered: "They are signed at a time dad couldn't have possibly signed it."

Decedent's close relationships with his wife, Mrs. Queener, and the Griffiths, the trial court found that "[t]here is nothing unnatural about the [beneficiary] designations." "Nonetheless," the trial court noted, "the [D]ecedent left his three natural children at least five times as much as he left to [Mrs. Queener] and [Mrs. Griffith]." Ultimately:

> The [trial] court f[ound] and conclude[d] that the [Estate]'s reliance upon the doctrine of undue influence has been diffused as to the two [CDs] designated for the benefit of [Mrs. Queener] and [Mrs. Griffith]. For the [trial] court to find that the [CDs], in question, were the result of undue influence, the [trial] court would have to find that the [CD]s were not the result of the [D]ecedent's own volition. Irrespective of the existence of any confidential relationship between [Mr. Griffith] and the [D]ecedent, the evidence affirmatively, as well as clearly and convincingly, demonstrates that the [CDs] were in accord with the [D]ecedent's intention and volition.

(Internal citation omitted).

The trial court looked less favorably, however, at a number of the checks written by Mr. Griffith from the Decedent's checking account during the Decedent's lifetime. The trial court held that the theory of undue influence has no application to the checks because none of the checks were issued or signed by the Decedent. Instead, the checks were each signed by Mr. Griffith. Therefore, the trial court held: "Irrespective of any other confidential relationship between [Mr. Griffith] and the [D]ecedent, it is without dispute that [Mr. Griffith] had become the [D]ecedent's agent for writing checks. That relationship brings basic principles of agency law into play." The largest check about which the Estate complains was written on April 11, 2011 in the amount of $11,311, which Mr. Griffith used to purchase a lawn mower for himself. Mr. Griffith defends his actions with respect to this check by explaining:

> [The] Decedent advised [Mr.] Griffith that he wanted to leave CDs to [Mrs. Queener], to [Mrs.] Griffith, and to [Mr.] Griffith. [Mr.] Griffith told [the] Decedent that there was no reason to give him a CD and that he was simply helping [the] Decedent as a friend. . . . [The] Decedent again expressed the desire to do something for [Mr.] Griffith. [Mr.] Griffith told [the] Decedent that if [the] Decedent wanted to do something for him that was fine and he would accept the offer if he ever needed help. While mowing one day, [Mr.] Griffith received a call from [Mrs. Queener] requesting him to go check on [the] Decedent at Brakebill. The lawn mower was on its last legs and [Mr.] Griffith knew that if he turned the mower off, he might not be able to start it again. Based upon [the] Decedent's wishes to give [Mr.] Griffith something, he believed it would be appropriate to buy the lawn mower. After purchasing the mower, [Mr.] Griffith told [the] Decedent about the purchase.

The trial court expressly rejected this explanation and found that there was no benefit to the Decedent whatsoever from this purchase. The trial court held that Mr. Griffith "violated the agency principle that 'whoever undertakes to act for another, in any matter, shall not, in the same matter, act for himself[.]'"

Another such transaction occurred when the Griffiths sold the car owned by the Queeners for $20,000. Following the sale, the Griffiths paid themselves $1,000 of the sales proceeds as a fee for their time in taking care of the car and selling it. The trial court found again that, while acting as the Decedent's agent in selling the car and acting as a signatory on the Decedent's checking account, Mr. Griffith acted for the benefit of himself and his wife by withdrawing the fee. The trial court found no evidence that the Griffiths rendered any services to the Decedent with any expectation of compensation and that to the contrary, the Griffiths "appear to have brought themselves within the 'family service rule.'" As such, the trial court held that the Griffiths were not entitled to a fee for their services related to the sale of the car. However, because the car was jointly owned by the Decedent and Mrs. Queener, the trial court held that only $500 of the fee could be recovered by the Estate.

The Estate also seeks reimbursement for ten checks totaling $1,444.05. Each of these checks were payable to Mr. Griffith, Mrs. Griffith, or the Griffiths' business. Mr. Griffith has argued that these checks were to reimburse the Griffiths for purchases made for the benefit of the Queeners or to compensate the Griffiths for services they performed for the Queeners. However, Mr. Griffith produced no receipts or evidence, other than his own testimony, to show that these expenditures actually were for the benefit of the Decedent. The trial court found that the record does not demonstrate that the transactions were, in fact, for the benefit of the Decedent or fair to him and that Mr. Griffith's writing of these checks for his own benefit violates the principles of agency. Furthermore, the trial court found that two of the checks written to Mrs. Griffith and totaling $900 "conflict with [Mr. Griffith]'s position that [the Griffiths] were acting in love and affection for the [D]ecedent." Moreover, the trial court found, the record does not sustain that the Decedent should have expected that Mrs. Griffith expected to be compensated for her services to the Decedent. The trial court held that the Estate was entitled to recover $1,444.05, the total of the checks at issue.

The Estate also complains about amounts paid to Heritage for the Queeners' apartment after the Decedent was admitted to the hospital in March 2011. The Estate argues that once the Decedent was admitted to the hospital, these payments to Heritage were no longer to his benefit and were for the sole benefit of Mrs. Queener. However, Ms. Junck and Mr. Griffith both testified at trial that at the time these payments were made, the Decedent was expected to return to Heritage after his hospitalization. The trial court found and concluded that "it was not determined at the time of those payments that the [D]ecedent would not return to the apartment and that there was insufficient evidence that the [D]ecedent did not remain liable, along with [Mrs. Queener], for these payments."

Likewise, the trial court overruled the Estate's complaint about payments made for the Decedent's car insurance after the Decedent could no longer drive. The trial court held that these payments were not improper because the Decedent continued to own the car with Mrs. Queener and remained liable to the insurance company for the payments. The Estate also sought recovery "for payments pertaining to [Mr. Griffith]'s home in Helenwood, Tennessee after the [D]ecedent no longer lived there. However, there was no proof that [Mr. Griffith] wrote any checks for any such payments or that any such payments were made at his direction."

Ultimately, the trial court awarded the Estate $13,255.05 plus pre- and post-judgment interest. Because each of the parties prevailed, in part, the trial court found and concluded that the costs should be taxed to the parties equally. This appeal followed.

## ISSUES

The Estate presents the following issues on appeal, which we have restated slightly and condensed:

1. Whether the trial court erred in denying the Estate's claim for recovery of the proceeds of CDs 89 and 91?

2. Whether the trial court erred in denying the Estate's claim for a portion of the checks written by Mr. Griffith from the Decedent's checking account during the Decedent's lifetime?

Mr. Griffith presents the following issues on appeal, which have been restated slightly and condensed:

3. Whether the trial court erred in finding that Mr. Griffith violated the principles of agency in connection with the purchase of a lawn mower using the Decedent's funds?

4. Whether the trial court erred in finding that Mr. Griffith violated the principles of agency in connection with ten checks written by Mr. Griffith from the Decedent's checking account and made payable to Mr. Griffith or Mrs. Griffith?

5. Whether the trial court erred in taxing the court costs equally between the parties?

ANALYSIS

*A.*

Because this is an appeal from a bench trial, we review the trial court's factual findings *de novo*, presuming their correctness unless the evidence preponderates otherwise. *Boote v. Shivers*, 198 S.W.3d 732, 740 (Tenn. Ct. App. 2005); Tenn. R. App. P. 13(d). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Boote*, 198 S.W.3d at 741. The presumption of correctness does not apply to the trial court's conclusions of law. *Id.*

"When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is in a far better position than this Court to decide those issues." *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 824 (Tenn. Ct. App. 2012) (citing *In re Arteria H.*, 326 S.W.3d 167, 176 (Tenn. Ct. App. 2010), *overruled on other grounds*). "If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Id.* (quoting *Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010)).

*B.*

The Estate argues that the trial court erred in denying the Estate's claim as to the CD proceeds because "[t]he preponderance of the evidence sho[w]s that the [t]rial [c]ourt erred in failing to find that [the] Limited Agreements were a fabrication by [Mr.] Griffith on old forms from his 'white notebook' taken to the [credit union] for the benefit of his family." In support of its "white notebook" theory, the Estate points to portions of Mr. Griffith's trial testimony:

> Q. This [limited agreement] was actually, as you told us previously, it was -- he pre-signed three or four of these, didn't he?
>
> A. I said I didn't know.
>
> Q. Well, in your deposition, . . . I said, how did this document get to the [credit union]. And . . . you said, I think that [the Decedent] had pre-signed three, or four, or five of these that I kept in his little white notebook at -- as mom's in case he didn't like going down to continue CDs.
>
> A. And I stand by that. I think -- I assume -- I don't remember.

* * *

[MR. JOHNSON, MR. GRIFFITH'S COUNSEL]:   I'm sorry. Mr. Chastain [the Estate's counsel] left out part of the --

THE COURT:  You can read the rest of it. You get to read the rest of it, Mr. Johnson.

MR. JOHNSON:  On 150: And you say you were holding -- you think you were holding this document.  I think I probably was.  I don't fully remember.

THE COURT:  Okay.

* * *

Q.     Now, when you testified that [the Decedent] pre-signed three, or four, or five of these, were they all completed and signed at the credit union, or did you just take these home and get them signed? How did that happen?

A.     I don't know. I don't remember. I did a lot -- you have got to realize, I was doing [Mrs. Queener]'s account too. So I -- it might have been for [Mrs. Queener] since I had -- I was her power of attorney. I -- I don't remember.

Mr. Griffith refuted this "white notebook" theory through the trial testimony of Ms. Taylor, who repeatedly testified that she personally witnessed the Decedent sign both of the Limited Agreements and that she would not have provided Mr. Griffith or the Decedent with extra blank forms to execute outside of her presence.  She also testified that she would not have accepted a form bearing the Decedent's signature and brought into the credit union by Mr. Griffith.

The Estate takes issue with Ms. Taylor's credibility and raises a number of factual issues in an attempt to demonstrate that the evidence preponderates against the trial court's findings that Ms. Taylor's testimony was credible.  First, there is an issue regarding the address for the Decedent printed on the Limited Agreements.  Ms. Taylor testified that a member's address is automatically printed from the credit union's "system" onto any forms printed by the credit union to be signed by the member.  When the Decedent first became a member of the credit union, in November 2008, the Decedent's address entered into the credit union's "system" was an address on Coleman Road in Knoxville.  In or around April 2010, the Decedent's address in the system was changed to an address on Couch Mill Road

- 10 -

in Knoxville. However, the Coleman Road address is printed on the Limited Agreements at issue. The Estate argues that this shows that the Limited Agreements were printed before April 2010, despite reflecting that they were received and entered into the credit union's system in April 2011. At trial, Ms. Taylor testified that the inclusion of the Coleman Road address on the Limited Agreements did not necessarily mean that the forms had been printed prior to April 2010. She testified that if she was looking at one of the earlier CDs that had been purchased prior to April 2010 and printed the forms while looking at that CD, it may have resulted in the forms being pre-filled with the Coleman Road address. We note that the record reflects that the CD account numbers are not pre-filled on the Limited Agreements and are instead handwritten onto the Limited Agreements. Consequently, there is nothing on a Limited Agreement indicating to which CD it relates until the CD account number is handwritten onto the form.

The Estate also argues that it "is not consistent with the standard procedures or operations of the [credit union] or the contractual terms of the AUS[F]" for the date written on a credit union form to reflect the date the form was entered into the credit union system instead of the date the member signs the document. However, Ms. Taylor clearly testified that the reality of what actually happened day-to-day with the handling of these documents was not always consistent with the credit union's "standard practice." Moreover, the dated lines on the Limited Agreements at issue expressly state that they are the date the credit union received the form and the date the form was entered into the credit union's system. There is a separate line on the Limited Agreements that is intended for the date that the member signs the document; however, no date was written on that line on either of the Limited Agreements.

Ultimately, the Estate argues that Ms. Taylor's testimony "at best, could be characterized as confusing and, at worst, dishonest, but in all was simply not credible." The Estate further argues that, as a result, Ms. Taylor's testimony should be disregarded under the "cancellation rule."[4] However, the Estate failed to raise this argument regarding the cancellation rule before the trial court. "It is axiomatic that issues are considered waived on appeal by the failure to present them at trial." *Hill v. Tapia*, No. M2012-00221-COA-R3-CV, 2012 WL 6697308, at *6 n.3 (Tenn. Ct. App. Dec. 21, 2012) (citing *ABN AMRO Mortg. Grp., Inc. v. S. Sec. Fed. Credit Union*, No. W2011-00693-COA-R3-CV,

---

[4] "The courts of this state adhere to the rule that contradictory statements by the same witness regarding a single fact will cancel each other out." *Helderman v. Smolin*, 179 S.W.3d 493, 501 (Tenn. Ct. App. 2005) (collecting cases). "*If determined by the trial court to be contradictory*, the statements by the witness are considered to be 'no evidence' of the fact sought to be proved." *Id.* (citing *Wilson v. Patterson*, 73 S.W.3d 95, 104 (Tenn. Ct. App. 2001) (emphasis added). "The 'cancellation rule' only applies, however, 'when the inconsistency in the witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence.'" *Id.* at 502 (quoting *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 483 (Tenn. Ct. App. 1978)).

2011 WL 5590320, at *4 (Tenn. Ct. App. Nov. 17, 2011)). "[T]he Tennessee Supreme Court previously considered the cancellation rule with regard to testimony admitted at trial, only after the party seeking to exclude the evidence made a contemporaneous motion to strike the purportedly conflicting testimony." *Id.* (citing *Davis v. McGuigan*, 325 S.W.3d 149, 157 n.3 (Tenn. 2010); *Helderman v. Smolin*, 179 S.W.3d 493, 501 (Tenn. Ct. App. 2005)). The Estate fails to cite to any portion of the record wherein it made a motion to strike any part of Ms. Taylor's testimony or otherwise argue that the cancellation rule should apply. As such, this cancellation rule argument has been waived. *See Searcy v. Axley*, No. W2017-00374-COA-R3-CV, 2017 WL 4743111, at *8 (Tenn. Ct. App. Oct. 19, 2017) ("[I]t has long been the general rule that questions not raised in the trial court will not be entertained on appeal. . . ." (quoting *City of Memphis v. Shelby Cnty., Tenn.*, 469 S.W.3d 531, 560 (Tenn. Ct. App. 2015)).

Finally, the Estate argues that the evidence preponderates against a finding "that transactions conducted by [Mr.] Griffith as to [the Limited Agreements] for the Decedent, as the weaker party, were fair." To this end, the Estate argues that "just as the [t]rial [c]ourt found that [Mr.] Griffith improperly used [his] position as a dominant party to make expenditures from the checking account . . . the same finding must extend to the Limited Agreements" and all other expenditures about which the Estate complains. Importantly, the claim raised by the Estate in its Amended Complaint is that the Decedent made Mrs. Griffith and Mrs. Queener the beneficiaries of CDs 89 and 91, respectively, because he was unduly influenced by Mr. Griffith to do so. "[U]ndue influence can be established by showing 'suspicious circumstances' leading to a conclusion that the allegedly influenced person did not act freely and independently." *Ellis v. Duggan*, 644 S.W.3d 85, 115 (Tenn. Ct. App. 2021) (citing *Jarnigan v. Moyers*, 568 S.W.3d 585, 591 (Tenn. Ct. App. 2018)). However, we agree with the trial court that the record in this case "affirmatively, as well as clearly and convincingly, demonstrates that the [Limited Agreements] were in accord with the [D]ecedent's intention and volition."

Notwithstanding the suspicious circumstances surrounding the Limited Agreements, and with appropriate deference to the trial court's finding regarding the credibility of Ms. Taylor, we conclude that the evidence preponderates in favor of the trial court's findings of fact.

## C.

We turn next to the issues regarding the trial court's finding that Mr. Griffith violated the principles of agency in connection with certain, but not all, disbursements made from the Decedent's checking account.

"Conversion is the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the

property." *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009) (collecting cases). "A cause of action for conversion occurs when the alleged wrongdoer exercises dominion over the funds in '*defiance of the owner's rights.*'" *Id.* (quoting *Hanna v. Sheflin*, 275 S.W.3d 423, 427 (Tenn. Ct. App. 2008)) (emphasis in original). When determining whether various transactions were in defiance of the owner's rights, we must look separately at the circumstances of each transfer or transaction. *See id.* at 222.

The trial court found that "[i]rrespective of any other confidential relationship between [Mr. Griffith] and the [D]ecedent, it is without dispute that [Mr. Griffith] had become the [D]ecedent's agent for writing checks." This finding of fact by the trial court[5] is not challenged by Mr. Griffith on appeal. It is long-settled in this state that "whoever undertakes to act for another, in any matter, shall not, in the same matter act for himself[.]" *Corim, Inc. v. Sam Blair Co.*, 721 S.W.2d 256, 259 (Tenn. Ct. App. 1986) (quoting *Heard v. Miles*, 222 S.W.2d 848, 853 (Tenn. Ct. App. 1949)). Therefore, in any transaction between a principal and his agent "by which the agent obtains a benefit, *a presumption arises against its validity which the agent must overcome.*" *Id.* (emphasis in original).

*i.*

The largest check drawn on the Decedent's account for which the Estate seeks recovery is the April 11, 2011 check in the amount of $11,311, which Mr. Griffith used to purchase a lawn mower for himself. Mr. Griffith asserts that the trial court erred in finding that he violated the principles of agency in connection with this purchase. Specifically, Mr. Griffith argues that "[b]ased upon [the] Decedent's wishes to give [Mr.] Griffith something, [Mr.] Griffith believed it would be appropriate to buy the lawn mower at issue[,]" despite the fact that Mr. Griffith informed the Decedent of his purchase only after it was completed. Mr. Griffith further argues that "[t]he Estate presented no evidence contradicting [Mr. Griffith's] testimony, and there is no reason why such testimony should not be believed." However, Mr. Griffith cites no authority to support his suggestion that his subjective belief regarding the appropriateness of the purchase somehow means that the purchase did not violate this state's long-established agency principles.

Due to the agency relationship between Mr. Griffith, as the agent, and the Decedent, as the principal, created by the AUSF, any checks written from the Decedent's checking account by which Mr. Griffith obtained a benefit carries a presumption *against* its validity. *See Corim*, 721 S.W.2d at 259. This presumption is Mr. Griffith's to rebut. *See id.* Mr. Griffith cannot show, and does not even attempt to argue, that his purchase of a lawn mower for his own use and benefit was also of any use or benefit to the Decedent, nor does he argue that the Decedent later ratified this purchase.

---

[5] "The existence of an agency relationship . . . 'is a question of fact under the circumstances of the particular case[.]'" *Johnson v. LeBonheur Child.'s Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002) (quoting *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 724 (Tenn. 2000)).

- 13 -

Moreover, "under no circumstances" may an agent "act for himself or for any other than the principal without first making full and complete disclosure of the facts to the principal." *Ellison v. Alley*, 842 S.W.2d 605, 608 (Tenn. 1992) (quoting *Heard*, 222 S.W.2d at 851). Notably, Mr. Griffith did not disclose to the Decedent that he intended to use $11,311 of the Decedent's funds to purchase himself a lawn mower, which had no benefit to the Decedent, until after he had already done so.

Mr. Griffith has not overcome the presumption of invalidity that arises from his purchase of the lawn mower using the Decedent's funds. Therefore, the trial court did not err in awarding the Estate a judgment for $11,311 as a result of this disbursement from the Decedent's checking account.

*ii.*

Mr. Griffith next challenges the trial court's award to the Estate of $1,444.05. This amount represents the collective amount of ten checks written by Mr. Griffith, drawn on the Decedent's checking account, and made payable to Mr. Griffith or Mrs. Griffith. Mr. Griffith argues that all of the checks "would have only been for reimbursements for expenses incurred for the Decedent" and that "the Decedent knew of such reimbursements." However, the record establishes, and the trial court found, that two of the checks, totaling $900, were not reimbursements for expenses incurred but rather were more akin to fees paid to Mrs. Griffith for services she performed for the Decedent, such as preparing his room at Heritage for occupancy, repairing his room, taking him to medical appointments, and storing and "interchang[ing] the Queeners' clothes seasonally."

As this Court has explained:

> The family service rule provides that family members are generally precluded from receiving compensation for their services to other family members because the law presumes that these services were gratuitous, motivated more by love and affection than by expectation of compensation. *Key v. Harris*, 116 Tenn. 161, 171, 92 S.W. 235, 237 (1905); *Gorrell v. Taylor*, 107 Tenn. 568, 570, 64 S.W. 888, 888 (1901); *In re Conservatorship of Groves*, 109 S.W.3d 317, 356 (Tenn. Ct. App. 2003); *Cobble v. McCamey*, 790 S.W.2d 279, 281–82 (Tenn. Ct. App. 1989).

> The presumption raised by the family service rule is rebuttable. Persons seeking compensation for services rendered to deceased family members may recover if they prove either that the deceased family member expressly agreed to pay for the services or that the deceased family member knew or should have known that the family member providing the services expected compensation or reimbursement. *Gorrell v. Taylor*, 107 Tenn. at

570, 64 S.W. at 888; *Estate of Cleveland v. Gorden*, 837 S.W.2d 68, 71 (Tenn. Ct. App. 1992). Persons seeking compensation for their services must also establish either the amount of the expenditures made on the decedent's behalf or the reasonable value of the services rendered. *In re Conservatorship of Groves*, 109 S.W.3d at 356.

* * *

The types of services covered by the family service rule include the personal, domestic, and household services that family members customarily render to each other without expectation of payment. *See, e.g.*, *Key v. Harris*, 116 Tenn. at 166, 92 S.W. at 236 (waiting on a sister because she was "as helpless as a baby"); *Gorrell v. Taylor*, 107 Tenn. at 569, 64 S.W. at 888 (describing the services provided as the "delicate, personal, and comforting services which are essential to the welfare of a sick person"); *In re Conservatorship of Groves*, 109 S.W.3d at 324 (caring for a physically and mentally infirm relative in the caregiver's home); *Cobble v. McCamey*, 790 S.W.2d at 280 (services included cooking meals and looking after personal needs).

*In re Est. of Marks*, 187 S.W.3d 21, 29–30 (Tenn. Ct. App. 2005). As the trial court found, and the record reflects, the services provided to the Decedent by Mrs. Griffith fall within the scope of the family service rule. There is no evidence that the Decedent expressly agreed to pay Mrs. Griffith for these services. Furthermore, while Mr. Griffith testified that the Decedent knew of the "reimbursements," there is nothing in the record to suggest that the Decedent expressly agreed to pay Mrs. Griffith for her services or that he should have known that Mrs. Griffith expected compensation for her services.

The remaining eight checks at issue are checks for which there is no receipt,[6] there is no evidence of the item allegedly purchased, or for which the reimbursed amount exceeded the expense incurred for the benefit of the Decedent. Mr. Griffith argues that, given the extent of care provided for the Decedent by the Griffiths and the fact that Mr. Griffith "wrote over 100 checks for the Decedent . . . it is not surprising that there are a few checks for which there are no longer receipts." As discussed above, due to the agency relationship between Mr. Griffith and the Decedent, Mr. Griffith must rebut the presumption that these expenditures are not valid. He has not done so.

---

[6] Notably, six of these eight checks were written for round numbers, either $50 or $100. Additionally, the receipt provided as supporting documentation for one of the checks written for $100 postdates the check by two weeks.

For these reasons, we conclude that the trial court did not err in awarding the Estate $1,444.05 for compensation for these disbursements from the Decedent's checking account.

*iii.*

Finally, the Estate argues that the trial court erred in denying its claim for recovery as to other checks written by Mr. Griffith during the Decedent's lifetime. These checks fall into various categories: (1) a number of purported checks written to Mr. Griffith, Mrs. Griffith, or the Griffiths' business totaling $4,304.94; (2) two checks written to Heritage Assisted Living totaling $2,099.33; and (3) purported checks written for utilities and expenses for Mr. Griffith's Helenwood, Tennessee home totaling $1,612.34. As to these checks, the Estate simply argues:

> The [t]rial [c]ourt awarded the Estate a judgment in the amount of $13,255.05 . . . against [Mr.] Griffith, as a dominant party, who exercised dominion and control over the Decedent's assets as an agent. There was not even a plausible argument that these disbursements were for the Decedent's benefit. . . .

> The [t]rial [c]ourt did not grant judgment to the Estate for all items sought as set forth in Trial Exhibit 20. The evidence preponderates against this denial. The fact remains that the same acts and use of control by [Mr.] Griffith supports the reversal of the denial of the claims for all the[se] amount[s] . . .

(Internal citations to the record omitted).

When determining whether the Estate is entitled to recover these amounts, we must look separately at each check. *See Ralston*, 306 S.W.3d at 222. The Estate complains about "all checks to Mr. Griffith and family as shown on Exhibit 20 in the amount of $4,304.94[.]" However, at trial, Ms. Junck testified that the Estate was only seeking to recover for certain amounts that were highlighted on Trial Exhibit 20. The amounts highlighted in Trial Exhibit 20 that represent disbursements to Mr. Griffith and his family do not total $4,304.94. As a result, this Court is unable to discern the specific checks or disbursements about which the Estate complains. Furthermore, the trial court ruled in the Estate's favor with regard to almost all of the checks written to either of the Griffiths and highlighted on Trial Exhibit 20. To the extent the Estate now seeks an award of any amount not highlighted on Trial Exhibit 20, that issue is raised for the first time on appeal and, thus, has been waived. *See Searcy*, 2017 WL 4743111, at *8.

There are only two highlighted amounts on Trial Exhibit 20 paid to either of the Griffiths that were not awarded to the Estate in full. First, there is a $1,000 cash withdrawal

made by Mr. Griffith from the Decedent's checking account. With regard to this withdrawal, the trial court found:

> Another such transaction occurred when the [Griffiths] sold the car owned by the [D]ecedent and [Mrs. Queener]. The [Griffiths] sold the vehicle for $20,000.00 and withdrew $1,000.00 for their time in taking care of the car and selling it. Here again, while acting as the [D]ecedent's agent in selling the car and in acting as a signatory on the [D]ecedent's checking account, [Mr. Griffith] acted for himself and [Mrs. Griffith] by withdrawing the $1,000.00 fee. . . . However, the vehicle was jointly owned by the [D]ecedent and [Mrs. Queener]. Only $500.00 of the $1,000.00 can be attributed to the [D]ecedent. Originally, the [Estate] sought the proceeds of $9,500.00 paid to [Mrs. Queener] for her one half (1/2) interest in the car, net of the fee of $1,000.00, but withdrew that claim during the trial.

Accordingly, the trial court awarded the Estate $500, or one-half of the withdrawn amount. Other than its general argument that because Mr. Griffith committed some bad acts, all of his acts must have been bad, the Estate makes no argument as to why this was an error by the trial court. We conclude that it was not.

The only other amount highlighted on Trial Exhibit 20 that the trial court did not award the Estate in full was a check in the amount of $100, for which the trial court awarded the Estate $53.06. However, a typed notation next to this entry on Trial Exhibit 20 states: "46.94 Pay in full for Dad's items[.]" As best this Court can discern from this exhibit, the Estate was indicating that it was willing to allow the Griffiths to retain $46.94 of the $100, as it was satisfied that amount was actually spent on items purchased for the benefit of the Decedent. Again, the Estate makes no specific argument with respect to why it should have been awarded this amount, and we find no error by the trial court.

With regard to the payments made to Heritage, the trial court found:

> However, as to the amounts paid to Heritage Assisted Living, where the [D]ecedent shared an apartment with [Mrs. Queener], the [trial] court finds and concludes that it was not determined at the time of those payments that the [D]ecedent would not return to the apartment and that there was insufficient evidence that the [D]ecedent did not remain liable, along with [Mrs. Queener], for these payments. The postnuptial agreement [between the Decedent and Mrs. Queener], mentioned above, did not pertain to these payments. There was no evidence that separate assets of the [D]ecedent were used for the payments. The [D]ecedent and [Mrs. Queener] were still married at the time of the payments. The payments were for joint marital debt.

Again, the Estate makes no specific argument with respect to why these payments were not appropriate. As the trial court found, these payments were for the benefit of the Decedent, and we find no error by the trial court.

Lastly, the trial court found no evidence of any purported payments for utilities and expenses for Mr. Griffith's Helenwood, Tennessee home totaling $1,612.34. Like the trial court, we can find no evidence in the record of any such payments. Accordingly, we find no error by the trial court for not awarding the Estate this amount.

### *D.*

Finally, Mr. Griffith argues that the trial court erred in taxing the court costs to the parties equally. The entirety of his argument with respect to this issue is:

> The [t]rial [c]ourt taxed the court costs to the parties equally. [Tennessee Rule of Civil Procedure] 54[.04](1) provides that "[c]osts included in the bill of costs prepared by the clerk shall be allowed to the prevailing party unless the court otherwise directs. . . ." Clearly, the primary issue in the case revolved around CDs 89 and 91, and the [t]rial [c]ourt ruled in favor of [Mr.] Griffith as to those CDs. Because [Mr.] Griffith prevailed as to the main issue in the case, the court costs should have been entirely taxed to Appellant/Petitioner.

As our Supreme Court has explained:

> Adjudging costs is within the reasonable discretion of the trial court. *Lock v. Nat'l Union Fire Ins. Co.*, 809 S.W.2d 483, 490 (Tenn. 1991). Furthermore, the trial judge may apportion the costs between the litigants as is deemed equitable. Tenn. Code Ann. § 20-12-119 (1994). Accordingly, the judgment of the trial court will not be disturbed on appeal absent a showing that the trial judge abused his discretion. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56 (Tenn. 1992); *Lewis v. Bowers*, 216 Tenn. 414, 392 S.W.2d 819, 823 (1965).

*Crew v. First Source Furniture Grp.*, 259 S.W.3d 656, 670 (Tenn. 2008). Given that both parties prevailed on some issues in the trial court, we see no reason to disturb the trial court's decision to tax costs equally.

## CONCLUSION

For all of these reasons, we affirm the judgment of the Chancery Court for Knox County. Costs of this appeal are taxed to the appellant, the Estate of John A. Queener, by and through Personal Representative, Carolyn Q. Junck, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE